**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STANDARD COIL PRODUCTS CO., Inc., Respondent.**

No. 4920.

United States Court of Appeals
First Circuit.

July 15, 1955.

Ruth V. Reel, Washington, D. C., with whom David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Samuel M. Singer, Washington, D. C., Atty., were on brief, for petitioner.

Stanley Geller, New York City, with whom Arthur Richenthal, New York City, was on brief, for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by the National Labor Relations Board seeking enforcement of its order of October 20, 1954 which order, adopting the findings of the Trial Examiner, ordered the respondent, Standard Coil Products Co., Inc., a manufacturer of television set tuners, to cease and desist from certain unfair labor practices. The Board found that the respondent had violated Secs. 8(a) (1) and 8(a) (2) of the National Labor Relations Act, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., when it initiated and assisted an Employee-Management Committee at its plant in North Dighton, Massachusetts, and had also violated Secs. 8(a) (1) and 8(a) (3) of the Act through its discriminatory discharge of John C. Martins who had been employed as an analyzer at the North Dighton plant.

The entire evidence relating to the Employee-Management Committee appears in the record and consists of a stipulation of certain facts, a copy of the announcement made to the respondent's employees concerning the creation of the Committee, a copy of an announcement made over the respondent's public address system and a copy of the minutes of the first meeting of the Committee.

It appears from this evidence that operations began at respondent's North Dighton plant on June 23, 1953, but that prior to this, on June 18, 1953, it had been decided by certain of the respondent's officials to form an Employee-Management Committee as soon as the number of employees reached 600. In August, 1953 the International Brotherhood of Electrical Workers, A.F.L., began an attempt to organize the plant. On September 1, 1953, the number of employees reached 600, and two days thereafter there was posted on the respondent's bulletin board a notice stating that an Employee-Management Committee would be established and that "The basic objective of this Committee to be the creation of a team, that in its joint efforts. will be of benefit to all concerned, and give you a voice in your job security * * *. It is anticipated that such Committee will probably discuss suggestions for betterment of working conditions, safety, quality, propriety of dismissals, and other topics of mutual interest." The Committee was to be made up of representatives elected by each section, the respondent's personnel manager and an employee of the personnel manager. This notice also stated that each employee could discuss his "employee-management problems" with his representative on the Committee who then in turn could take up the matter with the other members of the Committee at a Committee meeting. The Committee members would be compensated by the respondent for any time they spent on Committee functions.

The first meeting of the Employee-Management Committee was held on September 11, 1953. According to the minutes it was agreed that the main initial purpose of this Committee would be to establish a free flow of information between the employees and management. It was also decided that employees should not be permitted to smoke while waiting in line to punch out, that the possibility of installing another time clock should be investigated and that a study should be made in order to obtain some means of identifying each employee. The opening of a plant cafeteria and promotional procedure were also discussed as was the conduct of employees toward each other. The personnel manager was questioned about a union and he, not directly answering this question, stated that the respondent was attempting to run a plant where people would like to work and this policy would be followed irrespective of the presence of a union but that what could be done in the future depended in large part upon the cooperation of the employees in producing a quality tuner at competitive prices. Several employee representatives then expressed more or less anti-union opinions. The other points discussed at this meeting were the necessity of a curtain under a production line, the failure of an employee to follow the

instructions of a supervisor and the over-loading of work on a relief operator. It was stipulated that at the subsequent meetings of the Employee-Management Committee the topics of discussion were of the same general nature as at the first meeting.

The Board found that the existence of this Employee-Management Committee was an unfair labor practice in violation of Sec. 8(a) (2) of the Act which is as follows:

"(a) It shall be an unfair labor practice for an employer—

\*     \*     \*     \*     \*

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it \* \* \*."

There is no doubt that the respondent dominated the Employee-Management Committee. However, respondent strongly contends that its Employee-Management Committee was not a "labor organization" under Sec. 2(5) of the Act which provides as follows:

"Sec. 2. When used in this Act—

\*     \*     \*     \*     \*

"(5) The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

The courts have tended to construe broadly this definition of "labor organization". In National Labor Relations Board v. Stow Manufacturing Co., 2 Cir., 1954, 217 F.2d 900, certiorari denied 1954, 348 U.S. 964, 75 S.Ct. 524, it was held that the conducting of meetings of employees by the employer's president at which he made a speech and conducted a question and answer period constituted a "labor organization" under the Act. The Employee-Management Committee in the instant case certainly possesses more of the characteristics of a "labor organization" than did "The Monthly Meetings of All Departments" in the Stow Manufacturing Co. case and is substantially similar to the Advisory, Safety, Grievance and Benefit Committees involved in National Labor Relations Board v. General Shoe Corp., 6 Cir., 1951, 192 F.2d 504, certiorari denied 1952, 343 U.S. 904, 72 S.Ct. 635, 96 L. Ed. 1323, the "Open Door Committee" in National Labor Relations Board v. Saxe-Glassman Shoe Corp., 1 Cir., 1953, 201 F.2d 238, 240, the Employee Representative Group and Committees in National Labor Relations Board v. Sharples Chemicals, 6 Cir., 1954, 209 F.2d 645, and the Advisory Committee in Indiana Metal Products Corp. v. National Labor Relations Board, 7 Cir., 1953, 202 F.2d 613. In all these cases the employee organization was found to be a "labor organization" under the Act. However, the Sixth Circuit which broadly interpreted the statutory definition in the General Shoe and Sharples Chemicals cases, supra, has recently held in National Labor Relations Board v. Associated Machines, Inc., 6 Cir., 1955, 219 F. 2d 433 that an employee organization entitled the Associated Machines, Inc. Committee was not a labor organization within the meaning of the Act. This Committee was composed of the employer's general manager, who presided at the Committee meetings, and four employees elected by their fellow workers. Topics relating to production, plant efficiency, new equipment and other problems of mutual interest were discussed at the meetings of this Committee. The Committee had been organized principally in order that the management could be informed of the employees' recommendations and suggestions and could discuss with the employees any grievances that they might have. The court held that the Committee did not deal with the employer "concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work" and was therefore not a labor

organization within the meaning of the statute. It was stated at page 437 that the term "grievances" in Sec. 2(5) of the Act was used to refer to "major disputes in the labor field, to collective rather than individual or group complaints, and to chart the future of the employer-employee relationship rather than to correct the past or existing status of that relationship" and that grievances in this sense had not been discussed by the Associated Machines, Inc. Committee. The General Shoe Corp. and Sharples Chemicals cases were distinguished on the ground that in those cases wages, rates of pay, hours of employment, and conditions of work had been discussed whereas in the Associated Machines, Inc. case "such discussion as was had relating to working conditions involved individual rather than collective complaints and the request of the Committee for a parking lot, not available on company property, involved no aspect of 'working conditions.' "

In the instant case it is not necessary for us to distinguish between major grievances and minor grievances. It is evident that, applying even the standards of the Associated Machines case, the decision of the respondent's Employee-Management Committee with regard to the prohibition of smoking while waiting to punch out and its discussions of a cafeteria, promotion procedure, and a second time clock related to the future of the employer and employee relationship and to matters which had a collective rather than an individual interest. Thus we do not have to decide whether or not we accept the reasoning of the Associated Machines case as it is clear in the instant case that the Employee-Management Committee dealt with the respondent, if not on grievances, at least concerning "conditions of work."

■ The respondent has advanced the contention that to cause the disestablishment of its Employee-Management Committee would prevent it from legitimately communicating with its employees under Sec. 8(c) of the Act [1] and would also as a practical matter prevent its employees from effectively exercising their rights under Sec. 9(a).[2] Respondent also argues that Sec. 7[3] which gives employees the right to refrain from self organization or bargaining collectively through representatives of their own choosing would be a nullity if a committee such as the Employee-Management Committee in the instant case could not be utilized in order that the grievances and suggestions of non-union employees could be made known to their employer. This argument has logic and force but

1. "Sec. 8(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

2. "Sec. 9(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment."

3. "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."

nevertheless we are bound by the words of the statute. If the means chosen by the employer to deal with his employees comes within the scope of the definition of "labor organization", there is no doubt that the domination of or interference with such organization constitutes a violation of Sec. 8(a) (2). The Board's finding that respondent's Employee-Management Committee is within the scope of the statutory definition of "labor organization" was, in our opinion, not erroneous.

The Board in the petition before us also seeks the reinstatement, with back pay, of John C. Martins who was discharged by the respondent on October 2, 1953. The Trial Examiner found that Martins had been discharged in violation of Sec. 8(a) (3) and the Board adopted this finding and also further found that Martins' discharge had violated Sec. 8 (a) (1).

Martins had been originally hired by the respondent in June, 1953 to test tuners manufactured by it at its North Dighton plant. About a month later, Martins was promoted to analyzer in which capacity he would attempt to discover the cause of any defects in the tuners found by the testers. It appears that not only was the position of analyzer more remunerative but it was also more interesting and demanding of skill and experience than that of tester. Toward the end of September, 1953 a production crisis occurred which caused Martins and Frank Machado, also an analyzer, to be switched from analyzing to testing. Their pay remained at the same rate but Martins and Machado were dissatisfied to act as testers and Martins complained to their foreman stating "that he could not understand why he was testing when he was getting analyzer's pay." Their foreman explained to them that the instruments they were testing were tuners which had been rejected by the respondent's most important customer who had threatened to cease purchasing from respondent, and that the regular testers could not be switched from their positions on the pro-

duction line. On the morning following this complaint, Martins and Machado, who were apparently not satisfied with their foreman's explanation, especially in view of the fact that some of the regular testers had been put on production work, complained to their section's representative on the aforementioned Employee-Management Committee. This representative then gave notice of this complaint to the personnel manager, John A. Taska. Shortly thereafter Taska summoned Martins and Machado to his office to discuss their grievance. Also present at this conference were the Employee-Management Committee representative and two of respondent's foremen. The end result of this conference was the discharge of Martins by Taska who had become highly exasperated by what he called Martins' "uncooperative attitude."

The Board found that the real cause of Martins' discharge was his failure to accept as right Taska's position that Martins' grievance was in error. The Board contends that under Sec. 7 an employee has the right "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" and that taking part in a grievance procedure is a protected activity. It is further contended that it is an essential element of the right to present grievances to continue to believe in the justness of the grievance even though it is denied by the employer.

However, in this case it is not necessary to determine to what extent the right to present grievances is protected by Sec. 7 for it is our conclusion that on this record there was no substantial evidence supporting the Board's finding that Martins was discharged because of his belief in the rightness of his grievance.

Machado, who impressed the Trial Examiner as the most forthright and least biased and interested of the six witnesses who testified concerning Martins' discharge and who was not discharged by the respondent, expressed substantial-

ly the same attitude concerning the rightness of his grievance as did Martins. This is brought out by Machado's testimony at the hearing set forth as follows:

"The Witness: I told Mr. Taska I didn't think there was anything wrong with my attitude; I thought I had a good grievance and that was why I brought it up and there was some other conversation, I don't remember exactly what it was. I was told to go back to my job.

"Trial Examiner Bellman: Before you went back to your job, did you at any point agree with Mr. Taska you had been wrong in bringing up the grievance, that you didn't have a grievance?

"The Witness: No, I don't think I did."

It appears that Martins became sullen and resentful toward Taska during this conference and it was this attitude which caused Taska to become infuriated. Before Martins was discharged he and Machado were told to leave the office and the other parties to the conference discussed Martins' attitude and some relatively trivial incidents were brought out which tended to point out Martins' "uncooperative attitude". Each of the conferees then agreed that Martins should be discharged and he was then so informed.

On this evidence it would be reasonable to infer that Martins was discharged on rather capricious grounds and Taska's behavior was quite likely ill advised and intemperate. However, it cannot be inferred from the evidence that the motivation of Martins' discharge was Taska's resentment toward Martins' resort to the grievance procedure. It is well accepted law that an employer may discharge an employee for any reason, reasonable or unreasonable, so long as it is not for a reason prohibited by the Act. See Gullett Gin Co. v. National Labor Relations Board, 5 Cir., 1950, 179 F.2d 499, 501, reversed on other grounds, 1951, 340 U.S. 361, 71 S.

Ct. 337, 95 L.Ed. 337. The burden is upon the Board to prove affirmatively, by substantial evidence, that Martins' discharge was motivated by his pressing his rights under Sec. 7. Indiana Metal Products Corp. v. National Labor Relations Board, supra.

The Board in this case has not sustained this burden and has not presented evidence justifying its finding that Martins was discharged in violation of Sec. 8(a) (3) and (1) of the Act.

The Board's order, to be modified consistent with this opinion, will be enforced.