**CABOT CARBON COMPANY and Cabot Shops, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 16734.

United States Court of Appeals
Fifth Circuit.

June 9, 1958.

H. H. Hillyer, Jr., Richard C. Keenan, New Orleans, La., Kullman & Lang, Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel, for petitioner.

William W. Watson, N. L. R. B., Stephen Leonard, Associate Gen. Counsel, Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Atty., N. L. R. B., Washington, D. C., for respondent.

Before JONES, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case is before the Court on the petition of Cabot Carbon Company and Cabot Shops, Inc.[1] for review of an order of the National Labor Relations Board.

The question presented is whether employee-management committees formed for discussion of matters of mutual interest rather than for bargaining purposes are labor organizations within the meaning of the National Labor Relations Act (the Wagner Act), as amended. 61 Stat. 136, 29 U.S.C.A. § 151 et seq. If these committees are labor organizations, there is no doubt that Cabot interfered with them in violation of Sections 8(a) (2) and (1) of the Act.

Stated a little differently, the basic question is whether Congress intended to make it a violation of the law for employees to talk with their employer about production, working conditions, grievances and other matters of mutual interest, except as representatives of a labor organization. Cabot pitches its case on the legislative history of the Labor Management Relations Act of 1947 (the Taft-Hartley Act), amending the Wagner Act. Reliance on legislative history to support the validity of the employee committees is new in this type of case.

## I.

The Court must examine the why of these particular committees at Cabot plants, how they were formed and operate, the subjects they discuss with management—if we are to determine whether the Act permits such groups of employees to exist, and even co-exist alongside of certified labor unions.

Employee committees are not new. During World War II, the War Production Board encouraged war industries to institute "Employee-Management Committees" to promote increased production in critical industries.[2] In 1943 a representative of the War Production Board met with Reno Stinson, Cabot's Director of Industrial Relations, to discuss organizing employee-management committees and to supply literature on such committees. Stinson notified Cabot's plant managers to send elected employee representatives to a meeting, for the purpose of drafting a set of by-laws for submission to the employees. By-laws were drafted using the War Production Board material as a guide. These were approved by a vote of the employees. The War Production Board was furnished a copy and approved the form of the by-laws. Later, the by-laws were published in the Cabot Guide, a company policy manual. Except for minor revisions these by-laws are still in effect and are recognized as part of the company policy.

---

1. Cabot Carbon Company and Cabot Shops, Inc., are separate corporations, but each is a subsidiary of the same parent, Godfrey L. Cabot, Inc. This case concerns only the so-called "Southwestern Division" of these companies. In this division, Cabot Carbon Company operates numerous carbon black plants and gasoline plants, and produces oil and gas. Cabot Shops manufactures oil well equipment and other products at two plants.

2. It is established that the purpose of the employee-management committees suggested by the War Production Board "was to consider and improve all aspects of the production process which would tend to increase the quantity and quality of the products manufactured". According to the War Production Board instructions, the Committee was not to interfere with any bargaining machinery or undertake its functions. N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F.2d 822, 825, certiorari denied, 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595. See also Labor Management News, Vol. I, No. 4, dated August 16, 1943, the official weekly publication of War Production Drive, War Production Board, Washington, D. C.

The by-laws state the purposes of the committees, as follows:

"1. To bring about a better understanding between employees in every branch and service of our Company to the end that each will have a better insight to the other's problems.

"2. To provide a definite procedure for considering employees' ideas. As an example the following problems are of mutual interest to employees and management:

"a. Safety.

"b. Increased efficiency in production.

"c. Conservation of supplies, materials, and equipment.

"d. Encouragement of ingenuity and initiative.

"e. Grievances (*nonunion plants or departments*)."

The "rights and duties of committees" are also set forth:

"It is understood that the Employee Committees do not in any way detract from the authority and responsibility of the supervisory force but should serve to assist plant management in general in solving problems of mutual interest. It shall be the Committee's responsibility to:

"1. Meet with plant management at regular monthly meetings called by management and to attend any special meetings called by management.

"2. Work with management on those problems of mutual interest as set out under "Purposes".

"3. Make recommendations on the Suggestions from the employees in accordance with the Suggestion Plan.

"4. Call meetings of the employees if in their judgment this is necessary, and the Committee may invite management to attend if they think advisable, but all such meetings will be optional as far as management is concerned and will be on the employees' time.

"5. Handle grievances at nonunion plants and departments according to grievance procedure set up for these plants and departments. It shall be the duty of the Committee to call to the attention of management any troublemakers or acts of disturbance which would tend to lower morale, and it shall be the duty of the Committee to insist that gripes, grumbling, trouble-making among the employees either stop or be taken up under the regular grievance procedure at the plant."

The by-laws do not provide for any formal organization. There are no membership requirements, no dues, no officers, no funds. Employees at each plant elect a committee annually. The outgoing committee conducts the election. Monthly meetings are held with representatives of plant management. These meetings are called on company time and premises. The management assists in holding elections, calling meetings, preparing and posting minutes of the meetings, and defraying all expenses necessary to the operation of the committees.

Once a year, a meeting is held of the "Central Committee". This is composed of all the employee committeemen. There is no provision in the by-laws for a "Central Committee". Cabot contends that this is simply an annual, general meeting of the management to which employee committeemen are invited as guests. There is a morning session of speeches (some by outside speakers) and announcements (sometimes on proposed wage or benefit increases). There is no audience participation. In the afternoon the various plant managers and their assistants meet with top company management; the employee committeemen meet with Stinson. There is no negotiation or bargaining at these meetings. The Trial Examiner and the Board regard the Central Committee as a top-level or division-wide Employee Committee. They do not recognize the distinction petitioners draw between a morning

management meeting and an afternoon session of the employee committeemen with Stinson.

Cabot argues that it has never recognized any of the committees as having the right to represent its employees for purposes of collective bargaining. It has never negotiated with any Employee Committee any agreement concerning wages, hours, or working conditions. As a matter of fact only Reno Stinson has authority to negotiate any such agreement; management representatives at committee meetings, at most, can only listen—so far as bargaining is concerned. Of course, Cabot says, the company cannot gag its employees, and would not want to gag the committees. But committeemen themselves know that they cannot engage in any collective bargaining. The committees handle grievances only at the nonunion plants.

Over a period of years co-existence of Employee Committees and unions at Cabot plants has presented no serious problem. Cabot contends that prior to this proceeding, no union had ever objected to the committees; the unions handle all the bargaining functions. The Board admits in its brief that: "Employee Committees * * * have co-existed * * * though not always without friction. The Committee functions under such co-existence, however, generally have been limited to the handling of grievances for employees outside the bargaining unit and matters divorced from collective bargaining, such as plant efficiency and production problems. * * * In the event of conflict, the Employee Committees have customarily yielded to the artificial bargaining representative." Some committeemen are also members of the bargaining unit and the certified union. The Examiner found: "The Committees have never attempted to negotiate a contract with Respondents, and all benefits, privileges, or concessions to employees resulting from such conferences depend entirely upon company policy or magnanimity. Thereby all aspects of collective bargaining are either frustrated or entirely absent."

Employee Committees have discussed, complained about, or made recommendations concerning: seniority, transfer of employees, job classifications, job bidding, improvement of working facilities, overtime records and time cards, the merit system, layoff and makeup time, working schedules, vacation and sick leave, holidays, and allocation of company houses. The Trial Examiner, summarizing his findings, concluded that Cabot's dealings "avoid the usual concept of collective bargaining, but provide a forum for discussion of mutual problems, exchange of information, presentation and consideration of employee suggestions and recommendations, including the adjustment of grievances and the improvement of working conditions". This, says Cabot, does not make the committees labor organizations; such discussions between management and employees are contemplated in the 1947 Act.

The Board concluded that the Employee Committees and the Central Committee were labor organizations within the meaning of Sections 8(a) (2) and 2(5) of the Act. The Board found that the committees constitute "an integrated employee representation system established as company policy throughout the Southwestern Division". The Board found—and there is not much doubt about it, *if the committees are labor organizations*—that Cabot interfered with the administration of the committees, and assisted and supported the committees unlawfully. The Board ordered Cabot to "cease and desist from assisting, dominating, contributing financial support to, or interfering with the election and administration of the Employee Committees and the Central Committee * * * [or] otherwise interfering with the representation of their employees by or through any labor organization of their own choosing". Affirmatively, the Board's order requires Cabot "to withhold all recognition from and completely disestablish the Employee Com-

mittees and the Central Committee * * * as the representative of any of its employees for the purpose of dealing with Respondents concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work".

## II.

The goal of the National Labor Relations Act is to protect commerce and promote industrial peace by establishing and preserving for employees a right of collective bargaining with management through a representative of their own choosing. The realization of this goal, and the right of employees to bargain collectively through an individual or labor organization chosen by them is protected, in part, by Section 8(a) (2). This section provides that it shall be an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; Provided, That * * * an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." 29 U.S.C.A. § 158(a) (2).

Section 2(5), carried over without change from the original Act, defines "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, *of dealing* with employers concerning *grievances*, labor disputes, wages, rates of pay, hours of employment, or conditions of work". This is broad language, and the legislative history of the original act shows that Congress defined the term "very broadly" to reach "all organizations of employees that deal with employers".[3]

Though the language is broad, it does not necessarily include employee committees that "avoid the usual concept of collective bargaining" and have no bargaining powers, but "provide a forum for the discussion of mutual problems". The term "dealing with" includes "discussing with". But the terms cannot be equated. In ordinary language a deal or act of dealing is "the act of buying and selling; a bargain, a reciprocal arrangement".[4] And it seems fundamental to the sense of the situation that a group of employees is not a labor organization unless it exists for the purpose of negotiating or bargaining with employers. Of course, if an employee committee in fact negotiates or bargains, whatever its name or by-laws, it is a labor organization. That is not this case.

Section 2(5) is ambiguous in another important respect. Sections 2(5) and 8(a) (2) together prohibit an employee committee "dealing with employers concerning *grievances* * * *". But Section 9(a) expressly provides that "* * * any individual employee or a group of employees shall have the right at any time to present grievances to their employer". This is a proviso to the requirement in Section 9(a) that: "Representatives designated or selected for the purposes of collective bargaining by the majority * * * shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, **or** other conditions of employment".

The Act of 1947 added a proviso to the proviso. Section 9(a) now grants employees or groups the right to present their grievances to their employer "and to have such grievances adjusted without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided fur-*

3. Senate Report 573 on S. 1958, 74 Cong., 1st Sess., p. 7. See also Memorandum of March 11, 1935, prepared for the Senate Committee on Education and Labor, comparing S. 1958. (74th Cong., 1st Sess.) with S. 2926 (73d Cong., 2d Sess.), p. 22; reprinted in Legislative History of the National Labor Relations Act, 1935, Government Printing Office, 1949, p. 1347.

4. Webster's New International Dictionary (1958), "Deal * * * Act of dealing".

*ther,* That the bargaining representative has been given opportunity to be present at such adjustment".[5]  In a thoughtful study of the Act, the author stated: "The amended proviso is as ambiguous as the original * * * The new proviso to Section 9(a) encourages, if it does not require, employees to set up grievance procedures from which the collective bargaining representative would be excluded."  Cox, Some Aspects of the Labor Management Relations Act, 61 Harv.L.Rev. 1, 301, 313 (1948).

The statute, therefore, is subject to the construction that Section 2(5) defining "labor organization" does not apply to an employee committee that does not deal with (that is, bargain with) employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of work.  And, Sections 2(5), 8(a) (2), and 9(a), together, allow groups of employees to present to the employer grievances for adjustment, without the intervention of the bargaining representative, as long as there is no conflict with a collective bargaining contract.  The Board's position is that under the broad statutory definition, employees participate in Employee Committees which are labor organizations because they deal with management concerning "grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work".  Since the statute is ambiguous, we may bring in the legislative history without dragging it in by the tail.

The quest for congressional intent all too often leads to a will-o'-the-wisp trail where no foot can tread.  The footing is better, somewhat better, in this case.  The Conference Report is entitled to unusual respect.  The conferees rejected the Hartley bill (H.R. 3120) that passed the House.  They rejected the Taft bill (A. 1126) that passed the Senate as a complete substitute for the Hartley bill.  The conferees wrote their own bill.[6]  And this became the Labor-Management Act of 1947.[7]

The Hartley bill that passed the House provided expressly for recognition of the type of employee committee found at

5. "Sec. 9.  (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment."

6. See Report No. 510 on H.R. 3020, 80th Cong., 1st Sess., 1947, U.S.Code Cong. Service 1947, p. 135.

7. Representative Hoffman made a point of order in the House that the members were not considering the Hartley bill "which was adopted by the House by a vote of 308 to 107 but they [were] considering an entirely new bill that was written in conference by seven men".  Representative Michener's reply gives a succinct statement of the history of the bill.  "Mr. Speaker, in the case before us the House passed the Hartley bill, H.R. 3020.  The Senate amended the Hartley bill by striking out everything after the enacting clause and inserting a new bill which was in fact a substitute for the House bill.  The House bill was generally referred to as the Hartley bill and the Senate substitute as the Taft bill.  The Senate sent the amended Hartley bill back to the House and requested the concurrence of the House in the Senate amendment.  The House refused to agree to the Senate amendment, and the Hartley bill, as amended by the Senate, went to conference.  The conferees accepted neither the House bill nor the Senate substitute, but in fact wrote a new bill which is embodied in the conference report against which the gentleman from Michigan [Mr. Hoffman] has made a point of order.  93 Cong. Sec. 6539 (June 4, 1947).

the Cabot plants.[8]  Section 8(d) (3) of the bill provides:

"(d)  Notwithstanding any other provision of this section, the following shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act:

\* \* \* \* \* \*

"(2)  Permitting employees to confer with the employer during working hours without loss of time or pay.

"(3)  Forming or maintaining by an employer of a committee of employees and discussing with it matters of mutual interest, including grievances, wages, hours of employment, and other working conditions, if the Board has not certified or the employer has not recognized a representative as their representative under Section 9. \* \* \* "

In explaining the reason for this proposed amendment, House Report 245 states:

"Section 8(d) (3)—During World War II, many employers, with the help of the Government, set up labor-management committees with which they discussed matters of mutual interest.  This exception to Section 9(a) (2) permits employers whose employees have not designated a bargaining representative to set up similar committees and to discuss with them wages, hours, working conditions and other subjects of collective bargaining as well as other matters of mutual interest; but an employer may discuss subjects of collective bargaining only if the employees do not have a certified representative or one that the employer currently recognizes as the exclusive representative of the employees.  This clause does not permit 'company unions'.  The employer and the committee may discuss and reach decisions, but neither side may require the other to make an agreement, or to follow the procedure of collective bargaining set forth in Section 2(11).  The employees generally may elect members of the committee, but Section 9(a) (1) forbids the employer to create a formal organization having members among employees generally or other common characteristics of a labor union."

The Senate amended the Hartley bill (H.R. 3020) by substituting the Taft bill (S. 1126).  This bill did not contain Section 8(d) (3) or a Senate equivalent.  The Taft bill did add the proviso to Section 9(a) of the original Wagner Act allowing an employee or group of employees to present grievances for adjustment, which in context, applies to rates of pay, wages, hours of employment, or other conditions of employment.  In discussing the reason for Section 9(a), Senate Report 105 on S. 1126 states:

"Section 9(a):  The revisions of section 9 relating to representation cases make a number of important changes in existing law.  An amendment contained in the revised proviso for section 9(a) clarifies the right of individual employees or groups of employees to present grievances.  The Board has not given full effect to this right as defined in the present statute since it has adopted a doctrine that if there is a bargaining representative he must be consulted at every stage of the grievance procedure, even though the individual employee might prefer to exercise his right to confer with his employer alone.  The current Board practice received some support from the courts in the Hughes Tool case [Hughes Tool Co. v. N. L. R. B., 5 Cir.] (147 F.2d 69), a decision which seems inconsistent with another circuit court's reversal of the Board in N. L. R. B. v. North American Aviation Company, [9

8.  H.R. 3020, 80th Congress, 1st Sess., April 18, 1947, Sec. 8(d) (3); H.Rep.No. 245, 80th Cong., 1st Sess., p. 33.

Cir.] (136 F.2d 898). The revised language would make it clear that the employee's right to present grievances exists independently of the rights of the bargaining representative, if the bargaining representative has been given an opportunity to be present at the adjustment, unless the adjustment is contrary to the terms of the collective-bargaining agreement then in effect."

The Senate sponsors, therefore, thought that Section 9(a) was sufficient in itself to allow groups of employees to present grievances to their employer. The section was intended also as a rebuke to the Board for not giving full effect to the employees' right to present grievances independently of the rights of the bargaining representative.

When the Conference Committee settled down to writing its own bill, the conferees adopted the Senate approach. The House Conference Report No. 510 on H.R. 3020 explains that Section 8(d) (3) was not rejected on principle; it was considered as implicit in the terms of the act:

"Section 8(d) (3) of the Amended Labor Act in the House Bill provided that nothing in the Act was to be construed as prohibiting an employer from forming or maintaining a committee of employees and discussing with it matters of mutual interest, if the employees did not have a bargaining representative. This provision is omitted from the conference agreement since the act by its terms permits individual employees and groups of employees to meet with the employer and Section 9(a) of the conference agreement permits employers to answer their grievances."

Then, in discussing Section 9(a) the Report continues:

"* * * The existing law further provides that an individual employee or group of employees will have the right at any time to present grievances to their employer. But, as pointed out in the committee report on the bill in the House, this provision has not been construed by the Board as authorizing the employer to settle grievances thus presented.

"Both the House bill and the Senate amendment amended section 9 (a) of the existing law to specifically authorize employers to settle grievances presented by individual employees or groups of employees, so long as the settlement is not inconsistent with any collective bargaining contract in effect. * * *"

■ We cannot come to any other conclusion than that the Senate and House conferees intended to recognize the right of groups of employees to discuss with their employer matter of mutual interest, including grievances, wages, hours of employment, and working conditions. Congress saw this right as existing independently of the right of bargaining representatives to speak for their labor organization. Further, Congress intended—contrary to the practice of the Board—that employees would have the right to have their grievances settled without the intervention of a bargaining representative, provided that there was no conflict with a collective bargaining contract. The conferees explained what they were doing and Congress approved it.

The Board meets the issue obliquely: (1) the statement in the House Conference Report could scarcely have intended to assert that the Section 9(a) proviso affects the definition of labor organization in Section 2(5); (2) even if it be assumed that the "group of employees" in Section 9(a) may be interpreted to include a labor organization, an employer cannot dominate or interfere with the formation or administration of such labor organization. As we read the Act and its history, the Board misses the very point Congress wanted to make: That an individual employee or group of employees has the right to meet with the employer not as a labor organization for

collective bargaining but as an individual or as a group of employees to discuss hours, wages, working conditions and other matters of mutual interest and even to present grievances for adjustment.

It is not necessary to spin gossamer distinctions in order to show that one of the purposes of the Taft-Hartley Act was to allow more freedom of action to individual employees and to nonunion employee groups than the Wagner Act allowed. Between the two enactments World War II intervened. The War Production Board, a federal agency, initiated and developed employee committees. That Congress had actual knowledge of such committees is shown by House Report 245 in which Section 8 (d) (3) of the Hartley bill was explained in terms of employee-management committees developed by the War Production Board. The treatment of Section 9(a) in the House Conference Report No. 510 shows that the Conference Committee considered the precise question now before us. Our construction of the Act therefore is consistent with the knowledge of Congress and the thinking that brought the Labor-Management Act of 1947 into being.

## III.

In almost every case where the question has been raised the court has held that an employee committee or council or association is a labor organization.[9] None of these decisions goes into the aspects of legislative history scrutinized here. Some of the more important cases were decided prior to adoption of the Act of 1947. In several opinions, courts have recognized the conflict between Sections 2(5) and 9(a), and distinguished between "grievance" as used in Section 2(5) and "grievance" as used in 9(a).[10]

We rest our holding squarely on the meaning of the Act, as evidenced in its legislative history. The Act permits, and Congress intended that it should permit, the existence of employee-management committees which provide a forum for discussion of matters of mutual interest, but which are not formal organizations, do not follow collective bargaining procedures (formally or informally), have no powers to bargain collectively, and take no action inconsistent with the terms of an existing collective bargaining agreement.

9. N. L. R. B. v. Jas. H. Matthews, 3 Cir., 1946, 156 F.2d 706; Wyman-Gordon Co. v. N. L. R. B., 7 Cir., 1946, 153 F.2d 480; N. L. R. B. v. American Furnace Co., 7 Cir., 1946, 158 F.2d 376. These cases were decided prior to the Labor-Management Act of 1947. Later cases are to the same effect: N. L. R. B. v. Standard Coil Products, Inc., 1 Cir., 1955, 224 F.2d 465, 468, 51 A.L.R.2d 1268, certiorari denied 350 U.S. 902, 76 S.Ct. 180, 100 L.Ed. 792; N. L. R. B. v. Stow Mfg. Co., 2 Cir., 1954, 217 F.2d 900, certiorari denied 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751; N. L. R. B. v. Sharples Chemicals, Inc., 6 Cir., 1954, 209 F.2d 645, 652; Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 1953, 202 F.2d 613, 621; N. L. R. B. v. General Shoe Corp., 6 Cir., 1951, 192 F.2d 504, 507.

10. N. L. R. B. v. Associated Machines, Inc., 6 Cir., 1955, 219 F.2d 433, 437 held that grievances as used in Section 2(5) refers to "major disputes in the labor field, to collective rather than individual or group complaints, and to chart[ing] the future of the employer-employee relat [ing] rather than to correct[ing] the past or existing status. The Court cited with approval Hughes Tool Co. v. N. L. R. B., 5 Cir., 1945, 147 F.2d 69, 73 in which Judge Sibley, for this Court, stated: "Attention to grievances is therefore mentioned in Section 2(5) as part of the business of the representative, but Section 9(a) does not give him the *exclusive* right to handle them unless they really involve a bargaining for the unit, or an interpretation of the bargaining. On the contrary, it expressly gives each employee or group of employees the right to present their own grievances to the employer. The purpose is to preserve in each employee as a right this direct approach to the employer to secure full consideration of his case."

Taking a second look at the by-laws and also the Trial Examiner's Report, adopted by the Board, we find—in the language of the Examiner: "The Committees have never attempted to negotiate a contract * * * [A]ll aspects of collective bargaining are either frustrated or absent. * * * [The committees] avoid the usual concept of collective bargaining, but provide a forum for discussion of mutual problems, exchange of information, presentation and consideration of employee suggestions and recommendations, including the adjustment of grievances [at nonunion plants] and the improvement of working conditions". On these facts we find that the Employee Committees and the Central Committee at Cabot's plants were not "labor organizations".

## IV.

The integrity of collective bargaining depends upon the integrity of labor representatives as the agents of labor, free of interference and pressure from management. The whole theory of collective bargaining, to which this country is committed, rests on honest arms-length negotiations between management and labor. There is no place for a company union under the name of "Employee Committee" or under any other name. Congress has seemed to say however that there is a place for a bona fide, undominated, employee-management committee that is something less than a labor organization and something more than a committee to arrange soft-ball games. Congress intended that employees, individually or in groups, and independently of labor's undiminished right to bargain collectively, should be able to discuss problems of mutual interest with their employers—without violating the law.

The order of the Board is set aside and enforcement denied.