**RAYTHEON COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 6126.**

United States Court of Appeals First Circuit.

Heard Nov. 4, 1963.

Decided Jan. 7, 1964.

Robert L. Molinar, Lexington, Mass., for petitioner.

James C. Paras, Atty., N.L.R.B., Washington, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Marion L. Griffin, Atty., N.L.R.B., Washington, D. C., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This case involving a finding of violations of sections 8(a) (1) and 8(a) (3) of the Labor Management Relations Act as a result of the discharge of two employees has, after an arbitration proceeding and a Board hearing, resulted in a record appendix before us of some 235 printed pages and 90 pages of briefs.

We regret that our review requires comparable detail.

The employer, Raytheon Company, had a collective bargaining agreement with Local 1505, IBEW, AFL-CIO, the presently pertinent provisions of which were Article XXIII, providing, inter alia, that there should be "no stoppage of work," and that "the Union shall not question the right of the company to discipline or discharge employees for engaging in, participating in, or encouraging such unauthorized action * * * subject to the grievance procedure hereunder;" and Article XXI, outlining the grievance procedure, which was to culminate in arbitration. In addition the company had certain implementing rules regarding work stoppages, Rules 5 and 13, hereinafter referred to. On September 13, 1961 Raytheon indefinitely suspended, and on September 19 discharged, allegedly for violation of these provisions, the charging parties, Jane Reikard and Mary Fish, two employees assigned to the grid department at its Quincy, Massachusetts plant. Reikard until a year before had been chief steward for the union and both she and Fish had had lengthy employment. For "a long time" the grid department, which contained furnaces, had been displeasingly hot to the employees, who had several times asked that something be done. The matter had not, however, reached the stage of a formal grievance. On September 6 the department employees had unanimously signed an informal petition asking that the situation be remedied. Reikard had drafted the petition, had been the first to sign, and had delivered it to the secretary of Wills, the plant manager. Her testimony that she had been requested by another employee to do the drafting,[1] and that she had obtained "four or five" signatures, but had not been responsible for its circulation, was not contradicted. On September 12 the grid department was particularly hot. No reply had been made to the petition. Employee activity, hereinafter considered, took place on that morning which led to the two suspensions and discharges. Its nature, and whether it was not the cause is the primary issue in the case.

Reikard and Fish after suspension invoked the grievance procedures, and also filed unfair labor charges. The initial grievance procedures were unproductive and they requested arbitration. On October 12 they were notified by the union business manager by telephone that the hearing would take place on October 16. Reikard did not state whether or not she would attend. Fish said that she would call back shortly as to her intentions, but when she did not, both grievants were notified by telegram, apparently on the morning of the 16th, that the hearing was postponed to October 18. Later, on the 16th, Reikard wired the business manager that she was "unable to attend [on October 18] because of poor health. Mary [Fish] still in Maine * * * will advise you when I am able to go to arbitration." The manager wired in reply on the 17th that the hearing was postponed to October 19, and that the parties were expected to appear. The grievants did not attend, request further postponement, or offer any additional explanation for their absence. Experienced union counsel represented their interests and introduced evidence, including their own statements denying improper involvement. The arbitrator's subsequent report concluded, "[T]he evidence here is clear and convincing that the grievants instigated and led a walkout happily thwarted by the Chief Steward. For this gross breach of the Agreement, management may discipline and disciplinary penalty of discharge for the leaders was not improper."

The first question presented to the trial examiner, and thereafter to the Board was the effect to be given to the arbitrator's award. The examiner stated

1. Apparently in order to show this was protected activity the trial examiner found that Reikard drafted the petition at the request of the room steward, which was not the evidence. We are, however, for the purpose of this decision, assuming the petition to be protected activity.

that "the issue of violation of a Federal statute" was not before the arbitrator, and that his other findings were not "dispositive" because the Board's jurisdiction was exclusive. By "dispositive" he meant, as will hereafter appear, entitled to any weight. On this issue the Board (by 3-2 majority) affirmed. As its primary reason it agreed that the arbitration proceeding did not go into the question of the company's motive, viz., whether the assigned cause was a "pretext to mask the true reason." In the light of certain statements made by counsel at the hearing it is debatable whether the arbitrator did go into the company's motive, and we could not call the Board plainly wrong. It does not follow that the Board should not have accepted the arbitrator's findings on the issue concededly litigated. The Board did not reach this question because it found the hearing unfair in that on a request for a general continuance the arbitrator had granted only one day.[2]

Passing the fact that there had been not one, but two, continuances, we note at the outset that it was not the company, but the grievants' own representative, the union, that insisted there be no further continuance. There is nothing in the record to indicate that the union was processing the arbitration halfheartedly. The only reasonable conclusion as to Fish was that she absented herself voluntarily. Reikard's showing is little better. Seemingly her indefinitely disabling "poor health" developed very suddenly. We might doubt, like the minority Board members, if the indisposition was physical. In any event, we cannot think the Board would have expected us to rule it unfair if a trial examiner, rather than an arbitrator, had refused to grant a further continuance

on this record.[3] See, e. g., N. L. R. B. v. Somerville Buick, Inc., 1 Cir., 1952, 194 F.2d 56; N. L. R. B. v. Algoma Plywood & Veneer Co., 7 Cir., 1941, 121 F.2d 602. The Board's only cited case of Gateway Transp. Co., 1962, 137 N.L.R.B. 1763, is so different as not to warrant discussion. In view of the importance the Supreme Court lays upon the value of arbitration proceedings in effectuating the national labor policy we have strong doubts whether the Board should have rejected the arbitrator's finding that Reikard and Fish violated Article XXIII and company rules 5 and 13. However, we do not need to reach this question because the Board's decision on the merits must fall for lack of evidence to support it.

There are no findings of the Board, as such, to review, as the Board affirmed the intermediate report without modification. The trial examiner's principal summary findings were the following:

1. "[B]eyond doubt * * * there was no actual 'walkout' by any employees * * * nor * * * any work stoppage except that which, it is uncontradicted, was implicitly permitted, by Foreman Carbury when he told Chief Steward Shea that he could talk to the employees."

2. There is no "credible evidence in the record" that Reikard and/or Fish " 'incited' employees to engage in what as a fact did not occur."

3. Raytheon did not "offer any credible evidence tending to show that * * * [Hare] the management official invoking [suspension] * * * had * * * any reasonable ground to believe that Reikard and Fish had incited conduct which did not occur."

(1) Whether there was a "walk-out" or not may depend upon how the term is

---

2. The Board, unlike the examiner, did not hold that because the Board's jurisdiction was exclusive the arbitrator's findings were to be disregarded, but was apparently content, as we are, with its decision in Spielberg Manufacturing Co., 1955, 112 N.L.R.B. 1080, that normally such findings should be accepted.

3. We might also observe that the trial examiner did not reject the arbitrator's decision by finding unfairness, or, for all that appears, take any testimony on the subject. Accordingly, the Board has ruled the arbitration proceeding unfair without ascertaining whether in fact the grievants had been unable to attend.

to be interpreted. However, merely on the Board's evidence unaugmented by the company's, there was on the morning of September 12 an extended disturbance in the grid department. Although it is disputed who were the moving parties, admittedly a substantial number of the employees gathered in the ladies room, and around each other's benches, openly discussing a walkout to which a number were fully agreeable; there was one fracas, and five attempts were made by employees to persuade the union's chief steward, Shea, to come to the area, not all of which were for pacific purposes.[4] Shea testified that when finally he did come he obtained the foreman's assent to speak to *"a few* of his people outside the department."  (Ital. supplied, see infra, fn. 11) "By the time we arrived * * * [there] a fairly large group of people had gathered, by guess, maybe 12 or 15, although people were leaving and coming * * *." As Reikard herself put it, "There were about, like I said, 16 or 17 at the time, although before he [Shea] was done talking, at sometime or another it seemed that the whole department [some 40 women and 15 men] had been there, just about the whole department."  Although it is true that when Shea told the employees that management had plans under way to alleviate the heat they returned to work, the initial, uninvited,[5] outpouring of nearly all to see him illuminates the other Board testimony of the nature of the insurgent unrest. Though there was no "walkout" in the sense of packing up and going home, only a highly indulgent finder of fact could conclude that there had been no "Interfering with, obstructing or otherwise hindering production or work performance," (Rule 5) or " * * * wasting time * * * during working hours,"

(Rule 13) prior to Shea's arrival. The examiner's prefacing his finding with the words "beyond doubt," suggests that he did not recognize that he was even generous.

■ (2) The second finding, that there was no "credible evidence" that Reikard and Fish incited conduct which "as a fact did not occur" calls for two observations. In the first place, the issue was whether they had attempted to incite conduct in breach of company rules, not whether it occurred. But more important, while we are inclined to believe that the examiner's phrase "no credible evidence in the record" meant no evidence of a credible nature and not that he did not choose to credit it, in whatever sense he used the word it was incumbent upon him to examine the evidence before so characterizing it. N. L. R. B. v. Croscill Curtain Co., 4 Cir., 1961, 297 F.2d 294. This he failed to do.

The record contains the testimony of three witnesses called by respondent who testified either that Reikard and Fish asked them to join in a walkout that morning, or that they heard them invite others, and one who testified that Fish told her about the walkout and that she thought Fish had asked her to go along. None modified their testimony on cross-examination, although the first, Coleman, who had sought to do battle with Reikard that morning,[6] was rather excitable. The examiner disposed of Coleman on the ground of "bias and unreliability," and said that it was "unnecessary here to appraise in detail" (by which it is apparent he meant "appraise at all") the testimony of the others because their testimony on the stand was contrary to what they had told management prior to the dismissal of Reikard and Fish and "obviously could not have mo-

---

4. Some employees expressed a willingness to walk out, but only if the chief steward were to be present.

5. On the Board's evidence it was uninvited. On the company's the employees were gestured out by Reikard.

6. On both the Board's and the company's evidence, Coleman had told her supervisor, Loud, that the employees were planning a walkout. Reikard testified to having charged Coleman with lying, which, on this record, was obviously unjustified. The causes of Coleman's resentment were more complicated, and need not be gone into.

tivated the action." While admittedly what the company learned after the discharge had no bearing upon its belief at the significant moment of the discharge, the examiner made a specific finding, quite apparently for the purpose of suggesting that the company had no reason to believe Reikard and Fish had incited a walkout, that they had not in fact done so. Then, when faced with appraising the testimony of the witnesses who contradicted that finding, he said he had no duty to do so because they did not tell the company until too late. If the examiner had chosen to say that it was not necessary to decide whether Reikard and Fish were in fact guilty of urging the violation of company rules, that would have been one thing, but, instead, he played it both ways.

■ (3) In stating that there was no credible evidence tending to show that the company reasonably believed that Reikard and Fish had been guilty the examiner, again, misstated the issue. The question, of course, was what the employer believed and not whether that belief was reasonable. As we said in N. L. R. B. v. Standard Coil Products Co., 1 Cir., 1955, 224 F.2d 465, 470, 51 A.L.R.2d 1268, cert. den. 350 U.S. 902, 76 S.Ct. 180, 100 L.Ed. 792, "It is well accepted law that an employer may discharge an employee for any reason, reasonable or unreasonable, so long as it is not a reason prohibited by the Act." See also N. L. R. B. v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883.[7] The company did offer evidence that it believed Reikard and Fish to have been instigators of a walkout. This came from Hare, the official who determined their suspension. He testified that his belief was based on information coming from employees Coleman and Millet. As already mentioned, the examiner thought Coleman an "unreliable" witness. He felt that because the company failed to call Millet to testify at the unfair labor practice hearing,[8] this indicated that he was unreliable, too. The question, of course, was not whether the examiner felt Coleman and Millet were unworthy witnesses, but whether Hare was telling the truth when he said he believed them.[9] Then, to add weight to his finding that the company had offered no credible evidence of reasonable grounds to believe Reikard and Fish incited misconduct, the examiner referred to his finding, improperly, as we have said, arrived at, that it had not occurred.

■ We find this an unsatisfactory way to meet the Board's burden of proof. But even if we could say it was sufficient to dispose of the company's asserted reason for the discharge, the Board must not only do this, it must affirmatively find an improper reason. This finding was made in the following paragraph.

"In conclusion, the Trial Examiner is convinced and finds that the minor incident of September 12, permitted by Foreman Carbury and not interfered with by General Foreman Cram, was seized upon by management as a pretext for ridding itself of the two leaders of the move which resulted in the unanimous petition of grid department employees,

7. We need not consider to what extent the general principle of good faith mistake may not exonerate the employer if the employee is in fact engaged in a protected activity, cf. Cusano v. N.L.R.B., 3 Cir., 1951, 190 F.2d 898; N.L.R.B. v. Industrial Cotton Mills, 4 Cir., 1953, 208 F.2d 87, 45 A.L.R.2d 880, cert. den. 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086; N.L.R.B. v Burnup & Sims, Inc., 5 Cir., 1963, 322 F.2d 57, because whatever the events on September 12, they did not fall into this exception; nor has that been suggested.

8. Millet did testify before the arbitrator and a transcript of those proceedings was in evidence.

9. If the examiner wanted to find that Coleman and Millet did not in fact tell Hare what Hare said they did, this was another matter. It seems clear, however, that what he did was to decide the issue he put, namely, that Hare lacked "reasonable" ground to believe.

and particularly of Jane Reikard, whom Hare admitted he might have characterized to a Board agent as 'a thorn in the side of the company,' while acting as chief steward for the Union. The preparation and circulation of the petition was [sic] plainly protected activities, and Reikard's long service as chief steward constituted union activities. The termination of their employment for engaging in concerted and union activities was discriminatory, and violative of Section 8(a) (1) and (3) of the Act."

We find no adequate support for this paragraph. We have already dealt with the extent that the September 12 disturbance was "minor" [10] and "permitted" by foreman Carbury.[11] The statement that it was "not interfered with" by Cram involved a clear misunderstanding of the testimony. Even on Shea's testimony Cram interfered promptly. The most fundamental error, however, was the finding that the company discharged Reikard and Fish as the "two leaders * * * in the unanimous petition" of September 6. Even assuming that the company official, Hare, who made the discharge knew of the petition at that time,[12] there was no affirmative evidence that anyone in the company knew Reikard's connection with it beyond the fact that she had been the first to sign and the one who had made the physical delivery. But if the Board's burden of proof could be satisfied by inference, there was not even this with respect to Fish. The record contains no indication that Fish was a "leader" in this in any respect, or that the company thought she was, or could have thought so. If the company did not discharge Fish for the reason it said it did, then on the record before the examiner it had no reason. The finding that the company discharged Fish as a "leader" on September 6, as distinguished from September 12, was like the familiar example of the thirteenth stroke of a clock, not only unwarranted in itself, but infecting what went before.[13]

Finally, the examiner totally misused Hare's possible characterization of Reikard, which he admitted he might have made, describing her (again, not including Fish) as a "thorn in the side of the company." The examiner stated that this was while she was "acting as chief steward for the Union." However, the evidence warranted only a finding that the characterization was made long after, and in one specific connection only, namely, with reference to the events of September 12. If Hare had made the remark, but as of some other date, the Board should have offered its witness to prove it. The incongruity of the finding that Reikard did nothing on September 12, and that the company found her

10. To put the shoe on the other foot, there is no suggestion in the record that the company considered the September 6 petition as other than minor.

11. Shea not only testified that he had asked, and received, permission to talk to "a few" of the employees, but expressly denied that he had asked to speak to the "entire department." Although the examiner noted the difference at one point, later, when he came to draw certain inferences against the company he substituted "the employees" for "a few employees," as the basis thereof.

12. Singularly enough, although Hare was called as a Board witness for cross-examination, he was asked only whether, and not when, the petition came to his attention, a sizable gap.

13. We deduce that the company's real offense against Fish in the examiner's mind was suspending her without an opportunity to be heard, which the examiner considered "repugnant both to the fundamentals of law and to ethical practices of a reasonable employer." Under the grievance procedures Fish could (and did) have ample opportunity to be heard, as the company told her at the time. It was not for the examiner to pass moral judgments, and most certainly not this one. We need hardly say that his view of the law was equally mistaken.

a thorn in its side on September 12, was lost to view by this complete misstatement.[14]

A decree will be entered setting aside the order of the Board.

---

14. Elsewhere in his findings the examiner commented upon Hare's further "admission" that he had on other occasions found Reikard (again, not Fish) "aggressive" and "unreasonable." We will assume this to have been "while acting as chief steward." But although we should be reluctant to charge the Board with naiveté in its own special field, we do not consider "aggressive" a dirty word, or, more important, that unreasonableness is of uncommon occurrence or unexpected (from both sides) in labor relations. Indeed, we gather that the real dirty word is "sweetheart." Nor did the examiner find that this "admission" was the reason for the discharge. Since Reikard was no longer chief steward her behavior a year before would have been a peculiarly unlikely reason.