**FLORIDA STEEL CORPORATION,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

**United Steelworkers of America,
AFL–CIO, Intervenor.**

No. 78–1238.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1979.

Decided June 20, 1979.

Robert C. Lanquist, Jacksonville, Fla. (Hamilton & Bowden, Jacksonville, Fla., on brief), for petitioner.

Peter Winkler, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John G. Elligers, N. L. R. B., Washington, D. C., on brief), for respondent.

Jeffrey L. Gibbs, Washington, D. C. (Bredhoff, Gottesman, Cohen & Weinberg, Washington, D. C.; Bernard Kleiman, Gen. Counsel, United Steelworkers of America, AFL–CIO, Chicago, Ill., on brief), for intervenor.

Before BUTZNER and PHILLIPS, Circuit Judges, and EDWARD DUMBAULD, Senior District Judge for the Western District of Pennsylvania, sitting by designation.

BUTZNER, Circuit Judge:

Florida Steel Corp. petitions for review of an order of the National Labor Relations Board and the Board cross petitions for enforcement. The proceeding involves three unrelated findings of unfair labor practices. The complaint alleged that the company violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, as amended,* by laying off employees in January, 1975, without consulting with the union representing those employees and by refusing to furnish the union with information concerning the layoff. The complaint also charged that the company had violated these provisions of the Act by unilaterally instituting a schedule change during September, 1976. Finally, the complaint alleged that the company violated sections 8(a)(1) and 8(a)(3) when it fired a union sympathizer, Bobby Keziah.

After a hearing, an administrative law judge found that none of the charges was sustained by the evidence, and dismissed the complaint. The Board's general counsel and the union then filed exceptions. The Board adopted the administrative law judge's conclusion that the general counsel had failed to prove that the company refused to bargain with the union about its decision to lay off the employees. However, the Board held that the company had violated sections 8(a)(1) and 8(a)(5) by "failing and refusing to furnish the Union with information . . . regarding the effects of the layoff . . . [and] by failing and refusing to bargain about the effects of said layoff." The Board reversed the decision of the administrative law judge with respect to the schedule change and the discharge of Keziah. In addition to customary cease and desist provisions and a requirement that a notice of violation be posted in all of the company's plants, the Board's order directed the company to reinstate Keziah with backpay, to furnish the information requested by the union to the extent that it relates to the effects of the layoffs, and to bargain about those effects. Florida Steel Corp., 235 N.L.R.B. No. 129

(April 14, 1978). We enforce the Board's order except insofar as it relates to the firing of Keziah.

I

The company manufactures steel at several locations, including Croft, North Carolina. The production and maintenance employees at the Croft plant are represented by the United Steelworkers of America. During the period of the alleged unfair labor practices, there was no collective bargaining agreement in force.

The company laid off some employees for economic reasons, by seniority, in October, 1974. At a regular negotiating session on November 7, the company's spokesman told the union negotiator that economic conditions might force more layoffs in the future. At sessions on December 4 and 5, the company advised the union that business conditions were deteriorating so rapidly that a layoff in January appeared to be inevitable. On December 16, the company decided to lay off a large group of employees for economic reasons, beginning on January 2, 1975. On December 17, the company sent the union a letter setting forth the nature of the planned layoff, the date it would be effective, and the approximate number of employees involved. The letter also stated that the layoff would be done by seniority. On December 20, the company notified the union that a list of the employees to be laid off had been prepared and the company offered to discuss it. Because of prior commitments, the union negotiator was unable to meet with the company until after the date that had been set for the layoff to begin. The union requested a postponement of the layoff so that the union could negotiate about the layoff and its effects, and asked the company to supply answers to certain written questions as soon as possible. The questions dealt with the reasons for the layoff, the sources the company had relied upon in reaching the decision, the extent to which orders were being shifted from the Croft plant to other com-

* 29 U.S.C. §§ 158(a)(1), (5).

panies or to other plants belonging to the company, and the possibility of employing laid-off workers at the other plants.

The company declined to postpone the layoff. In a letter to the union on January 3, the company added that it did not "feel that the information requested is pertinent to the negotiations." The company said: "The effects of the decision [to lay off employees] are subject to bargaining, and that is what the company offered to do. When you declined this offer, then the layoff was made by straight seniority." Fifty-eight employees were laid off during January, and the company never supplied the information which the union had requested.

The administrative law judge held that the company had no obligation to supply the information. He found that the only role which the union sought to play in connection with the layoff was to formulate options such as shared work plans and to attempt to convince the company to elect such a plan instead of a layoff. He also found that the data sought by the union "related principally to the necessity for a layoff in light of activities at [the company's] other steel mills and the process by which a decision to have a layoff was reached." He concluded that "since the facts requested were not necessary to the role which the Union sought to play at that time, [the company] did not violate the Act when it refused to furnish them."

The Board rejected this part of the administrative law judge's decision. The Board reasoned as follows:

It is well established . . . that Section 8(a)(5) of the Act imposes on an employer the duty to furnish a union, upon request, information relevant and necessary to enable it to intelligently carry out its statutory obligations as the employees' exclusive bargaining representative. And, under the standard of relevancy as applied by the Board and the courts, it is sufficient that the Union's request for information be supported by a showing of "probable" or "potential" relevance. In the instant case, the information requested by the Union in its letter of December 20, to the extent that it concerned matters such as whether [the company] had policies for offering jobs at its other locations to the employees involved in the layoff and whether it planned to hire production and maintenance employees at its other locations, was clearly relevant and necessary to the Union's proper performance of its statutory obligations in representing the employees with respect to the effects of the layoff. Furthermore, in light of the Union's request for information relating at least in part to the effects of the layoff and its indications to Respondent that it desired to negotiate about the "overall decision" and "any aspects of the situation," it is clear that the role which the Union sought to play at the time was not limited to representing the employees solely with respect to the decision to layoff itself. We, therefore, conclude that, by refusing to furnish information concerning the effects of the layoff, Respondent violated Section 8(a)(5) and (1).

235 N.L.R.B. No. 129, slip op. at 5.

In urging us to set aside this conclusion of the Board, the company concedes that it had the obligation to supply relevant information to the union but argues that "relevancy in this case depends on an accurate picture of . . . 'the role which the Union sought to play at the time' it made the request for information." The company stresses that the Board must defer to the findings of the administrative law judge and urges us to adopt the examiner's view of relevancy. The company also emphasizes that the union did not request additional information when it was notified in early November of the possibility of a layoff or when it was notified in early December that a layoff was virtually certain to occur. The company concludes from this that

[i]n reality the Union, for all practical purposes, sought to play no role at all in connection with the January 1975 layoff, except perhaps lay the groundwork for the charges filed in this case. . . .
For these reasons the information was neither relevant nor necessary and it

could not have been a violation for the Company not to provide it.

We consider first the extent to which the Board was bound to follow the administrative law judge's findings and conclusions regarding the relevancy of information sought by the union. The responsibility for deciding whether an unfair labor practice has been committed is placed on the Board itself, not on the hearing officer. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 492, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *see* 29 U.S.C. § 160(c). The findings and conclusions of an administrative law judge are parts of the record in an unfair labor practices case, and the Board is not free to disregard them. However, they are entitled only to the weight that they reasonably command. The proper weight "depends largely on the importance of credibility in the particular case." 340 U.S. at 493–96, 71 S.Ct. at 469.

■ Applying this standard, we think the findings and conclusions of the administrative law judge regarding relevancy were entitled only to whatever weight they may attain because of the persuasive force of their logic. The union's right to obtain information depends on the scope of its statutory duties as bargaining agent. This reduces to a question of policy. Its resolution is primarily the responsibility of the Board, not the administrative law judge. Any dispute in this case as to "the role which the Union sought to play at the time it made the request for information" had nothing to do with the credibility of witnesses. It called only for an evaluation of letters written by the union to the company. Since credibility was not germane, the weight to be accorded the administrative law judge's conclusions was minimal.

Section 8(a)(5) of the Act imposes on an employer a broad duty to furnish relevant information to its employees' bargaining agent. This duty is rooted in recognition that union access to such information can often prevent conflicts which hamper collective bargaining. *Cf. NLRB v. Acme Industrial Co.,* 385 U.S. 432, 438–39, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). The standard of relevancy is considerably less stringent than that applicable to adjudicative proceedings. In the words of the Supreme Court, it is a "discovery-type standard" rather than a trial standard. Information must ordinarily be furnished if there is a "probability" that it is relevant. *See* 385 U.S. at 437, 87 S.Ct. 565.

■ The Board's determination of relevancy is entitled to considerable deference in the courts. This is so regardless of whether the ruling is viewed as a finding of fact which is conclusive if supported by substantial evidence or as a mixed question of law and fact in an area of substantial Board expertise. *San Diego Newspaper Guild v. NLRB,* 548 F.2d 863, 867 (9th Cir. 1977).

■ We need not explore the outer limits of relevancy in this case. It is clear that data concerning possible employment of laid-off workers at other plants meets the *Acme* criteria for relevancy. Any possibility of shifting workers from the Croft plant to another plant was relevant to the effects of the layoff and well within the proper scope of mandatory bargaining.

In an effort to show that the information requested by the union was irrelevant to any role that the union was actually attempting to play, the company emphasizes an assertion that the union had "minimal concern" about the impending layoff prior to receiving the company's letter of December 17. This argument, however, places the cart before the horse. The "discovery" standard of relevancy applies precisely because the union cannot decide what role it will seek to play until it obtains concrete, adequate information.

■ The company also suggests that the failure of the union negotiator to meet with the company immediately upon his receipt of the company's letter amounted to a waiver of any rights the union may have had to obtain the information. As Professor Gorman has pointed out, however, "In order that the union be deemed to waive its statutory right to information, its relinquishment of the right must be knowing,

clear and unequivocal." Basic Text on Labor Law: Unionization and Collective Bargaining 418 (1976). The record contains no substantial evidence of waiver. The union steadfastly insisted on its right to receive the information. The union negotiator's unavailability in December was due to prior engagements which he had explained to the company. On this record, the Board's conclusion that the company's failure to provide any of the information sought by the union improperly interfered with the union's performance of its statutory responsibilities is supported by substantial evidence.

The petition for review is denied as to the portions of the Board's order which deal with the January, 1975, layoff.

## II

■ The Board found that the company violated sections 8(a)(1) and 8(a)(5) "by unilaterally instituting a schedule change for the duration of the week of September 12, 1976, without prior notice to or consultation with the Union." The company frankly concedes that it altered the work schedule of rolling mill employees at the Croft plant for the week in question without notice to the union. The company argues, however, that its action was an unintentional "minor slip-up" that does not justify a remedial order.

Regardless of whether the company acted in bad faith, its unilateral change in working conditions deprived the union of an effective opportunity to bargain. Accordingly, it violated the Act. *See NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The decision whether or not to prosecute a violation of the Act is committed to the discretion of the Board's general counsel. 29 U.S.C. § 153(d). The petition for review is therefore denied as to this portion of the Board's order.

## III

■ The Board concluded that the company violated sections 8(a)(3) and 8(a)(1) when it discharged Bobby Keziah. The Board found that the company had seized upon the fact that Keziah broke into a locked company office as a pretext to fire him because of his union activities and because he had filed grievances. We deny enforcement of the relevant portions of the Board's order.

Keziah, who worked for the company for over six years, was known by the company to be an active union adherent. He was employed as a furnace "heater" on the night shift at the steel rolling plant. Due to an increase in production, Keziah was required to change his work hours beginning in April, 1976. The company directed him to report for work two hours before his regular shift in order to start the furnace. Keziah and some maintenance personnel were the only people in the plant between the end of the day shift at 4:00 p. m. and the beginning of the night shift at midnight. Keziah was inconvenienced by the change in hours, and he asked James Becker, the superintendent of the mill, for a transfer to the day shift. Becker refused to transfer him, and Keziah filed two grievances on April 27 naming Becker.

In August, 1976, the company became concerned about sabotage in the plant which appeared to be occurring during the period between the day shift and the night shift. Becker asked James Summerlin, a supervisor at the plant, to forego part of his summer vacation in order to observe the mill during the hiatus between the shifts.

On the first night of his vigil, Summerlin hid on the roof of the shift supervisor's office. From that point, he had a good view of the floor of the mill, although he could not see the door of the supervisor's office. Summerlin saw nothing suspicious until Keziah entered. Keziah approached the office with his plastic identification card in his hand and disappeared from Summerlin's view. Shortly thereafter, Summerlin heard the door of the office rattle and Keziah reappeared. The next night, from the same vantage point, Summerlin saw Keziah approach the office and disappear, after which Summerlin heard the door rattle. Five minutes later, Keziah reappeared and the door slammed.

Summerlin reported the events to Becker and stated that he suspected Keziah was breaking into the supervisor's office by forcing the bolt with his employee identification card. Becker in turn reported to his superiors. They decided that Summerlin and Becker would wait in the shift supervisor's office on the next night on which Keziah was scheduled to work. On that night, Summerlin and Becker went to the office in advance, locked the door, and waited with the lights out. Keziah entered the office shortly thereafter. When Becker asked Keziah what he was doing in a locked office, Keziah denied that it had been locked and attempted surreptitiously to turn the latch to its unlocked position. The next morning, the division manager fired Keziah.

In the proceeding before the Board, the general counsel contended that the real reason for the discharge was Keziah's union activities. The general counsel sought to prove that Becker and Summerlin falsely claimed that the office door was locked in order to justify firing Keziah.

The administrative law judge found that Becker and Summerlin had told the truth when they testified that the door was locked and that Keziah had lied with respect to this crucial issue. He concluded that "the General Counsel has failed to prove by a preponderance of the evidence on the record considered as a whole that [the company's] motive for discharging Bobby Ray Keziah on August 31, 1976, was one proscribed by Section 8(a)(3) and (1) of the Act."

The Board accepted the administrative law judge's finding that Keziah broke into the office. Nevertheless, the Board went on to find that the reason for the discharge was pretextual and therefore that the company violated sections 8(a)(3) and 8(a)(1). The Board relied on the company's knowledge of Keziah's union activities; on Becker's knowledge that Keziah had filed grievances against him in April; on the timing of the surveillance which coincided with Keziah's presence in the plant; and on the company's imposition of the drastic sanction without previously warning Keziah. The Board reasoned that the fact that an employee has performed misdeeds does not excuse a discharge that is motivated by anti-union reasons and concluded:

> While we do not condone the forced entry into the supervisor's office, . . . it is clear that [the company] merely seized upon the incident as an opportunity to rid itself of an open and active union adherent who, additionally, had filed grievances against one of its supervisors.

235 N.L.R.B. No. 129, slip op. at 13. On appeal, the Board argues that "the Company's long history of often unlawful resistance to organizing efforts by the very union which Keziah had so whole-heartedly supported" also supports the finding that the discharge was motivated by anti-union animus.

The scope of section 8(a)(3) of the Act is well settled. As we said in *NLRB v. Consolidated Diesel Electric Co.*, 469 F.2d 1016, 1024 (4th Cir. 1972):

> A discharge, whether the cause be good or bad and whether it be deemed harsh or lenient discipline, offends the Act *only* if discriminatorily motivated on account of union activity or, to state it another way, there must be an unlawful intent in the discharge. And the burden of establishing such discriminatory or unlawful intent, it is settled, falls on the General Counsel. When a cause other than union activity exists for the discharge, illegal motive cannot be based merely on the discharged employee's union organizational activity; and by offering only such proof, the General Counsel does not sustain his burden.

In *NLRB v. Patrick Plaza Dodge, Inc.*, 522 F.2d 804, 807 (4th Cir. 1975), we explained the burden of proof as follows:

> If in fact there was no cause for discharge, there may well be an inference that the assigned reason was pretextual. But when cause exists, the Board must show "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one." . . . "[E]vidence * * * which gives equal

support to inconsistent inferences" is not enough. Were the rule otherwise, any employee who had been guilty of conduct warranting discharge could protect himself by openly engaging in union activities, and run for luck . . .

Applying these standards, we conclude that the Board's decision cannot stand.

To begin with, Keziah's conduct furnished good cause for his discharge. The Board found that Keziah and other employees frequently entered the same office when the door was unlocked "during regular shift hours" and that information contained in written messages which were left in the office for Keziah's shift supervisor was "helpful, if not necessary" to Keziah in the performance of his duties. There is no evidence, however, that the company tolerated forced entry by employees into the office when it was locked between shifts. In addition, Keziah's false denial that the door was locked establishes that he knew he had no right to be there. The company unquestionably has the right to discipline employees who are guilty of wrongful acts in relation to company property. *Maryland Drydock Co. v. NLRB,* 183 F.2d 538, 540 (4th Cir. 1950).

The harshness of the sanction, in itself, affords no grounds for relief. *NLRB v. Consolidated Diesel Electric Co.,* 469 F.2d 1016, 1024 (4th Cir. 1972). Accordingly, the burden of proof fell on the general counsel to show that the firing was actually motivated by anti-union animus. *NLRB v. Patrick Plaza Dodge, Inc.,* 522 F.2d 804, 807 (4th Cir. 1975). There was no evidence that the company ever applied penalties less severe than discharge in any case involving similar or more serious misconduct on the part of another employee. As we have noted, the Board relied entirely on circumstantial evidence of unlawful intent. When viewed in the light of the company's legitimate and nondiscriminatory reason for discharging Keziah, we think the evidence of wrongful intent is outweighed to the point that it is not substantial. *See Maphis Chapman Corp. v. NLRB,* 368 F.2d 298, 305 (4th Cir. 1966). The timing of the surveillance plan is not substantial evidence. The administrative law judge and the Board both accepted the testimony that the surveillance was instituted in order to detect saboteurs, rather than to entrap Keziah. The surveillance gave the company reason to suspect that Keziah was breaking into the office. The company is not to be faulted for seeking proof. The fact that the company fired Keziah immediately after it obtained conclusive proof of his misconduct favors the company, not the Board. *Compare* Starbrite Furniture Corp., 226 N.L.R.B. 507, 509 (1976) (three-week delay between wrongful act and discharge supports a finding of violation).

The crucial flaw in the Board's conclusion is a total absence of a causal connection between the firing and anti-union animus. Without such a connection, evidence that the company knew of Keziah's union sympathies, that Keziah had filed grievances against Becker, and that the company had a general anti-union bias is of no avail. *NLRB v. Florida Steel Corp.,* 586 F.2d 436, 447–48 (5th Cir. 1978).

We conclude that the general counsel failed to carry his burden. We hold that the company had good cause to fire Keziah and that the Board's findings and conclusions on this issue are not supported by substantial evidence on the record as a whole. The relevant parts of the Board's order will not be enforced.

Accordingly, we enforce the order of the Board except insofar as it relates to the alleged violation of section 8(a)(3) in the discharge of Bobby Keziah. To that extent, we deny enforcement.