## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## PENINSULA GENERAL HOSPITAL MEDICAL CENTER, Respondent.

## PENINSULA REGIONAL MEDICAL CENTER, formerly known as Peninsula General Hospital Medical Center, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

## Nos. 94–1202, 94–1232.

United States Court of Appeals, Fourth Circuit.

Argued July 18, 1994.

Decided Oct. 18, 1994.

---

**ARGUED:** David S. Habenstreit, N.L.R.B., Washington, DC, for petitioner. Gary L. Simpler, Arthur Mortimer Brewer, Shawe & Rosenthal, Baltimore, MD, for respondent. **ON BRIEF:** Frederick L. Fein-

stein, Gen. Counsel, Linda Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Linda Dreeben, Supervisory Attorney, N.L.R.B., Washington, DC, for petitioner. Frances Taylor, Shawe & Rosenthal, Baltimore, MD, for respondent.

Before WILKINS and WILLIAMS, Circuit Judges, and SHEDD, United States District Judge for the District of South Carolina, sitting by designation.

Petition for review granted and enforcement denied by published opinion. Judge SHEDD wrote the opinion, in which Judge WILKINS and Judge WILLIAMS joined.

## OPINION

SHEDD, District Judge:

The National Labor Relations Board ("Board") has applied for enforcement, and Peninsula Regional Medical Center ("Peninsula") has petitioned for review, of an order reported at 312 N.L.R.B. No. 97 (1993), in which the Board found that an employee organization known as the Nursing Services Organization ("NSO"), which Peninsula formed, is a "labor organization" within the meaning of § 2(5) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 152(5); and that Peninsula dominated the NSO in violation of §§ 8(a)(1) and 8(a)(2) of the Act, 29 U.S.C. §§ 158(a)(1) and (a)(2). The Board ordered Peninsula *inter alia* to cease and desist from "[d]ominating, assisting, or contributing financial or other support to the NSO or any other labor organization" and to "withdraw all financial or other support from and completely disestablish the NSO." Peninsula's only contention in support of its petition for review is that the Board erred in determining that the NSO is a "labor organization" within the meaning of § 2(5). Because we agree with Peninsula, we grant the petition for review, set aside the Board's order, and deny enforcement.

I

The central purpose of the Act is "to protect and facilitate employees' opportunity to

organize unions to represent them in collective bargaining negotiations." *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 609, 111 S.Ct. 1539, 1541–42, 113 L.Ed.2d 675 (1991). The heart of the Act is § 7, which "grants employees the right to organize and form labor unions for the purpose of collective bargaining and other concerted activities." *Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251, 255 (4th Cir.1994). Section 7 provides in pertinent part that:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

29 U.S.C. § 157. Section 8 "identifies as unfair labor practices specific actions which interfere with the rights granted by [§] 7." *Ultrasystems Western Constructors*, 18 F.3d at 255.

Relevant for our purposes here, § 8(a)(2) provides that it is an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization." [1] This section reflects congressional recognition that "the maintenance of a 'company union,' dominated by the employer, may be a ready and effective means of obstructing self-organization of employees and their choice of their own representatives for the purpose of collective bargaining." *NLRB v. Pennsylvania Greyhound Lines*, 303 U.S. 261, 266, 58 S.Ct. 571, 574, 82 L.Ed. 831 (1938). This Court has similarly noted the problem associated with company unions:

> [T]he purpose of the Act is to prohibit anything which will enable the employer to exert influence on the representatives of the employees in the collective bargaining which it is the purpose of the Act to promote. When the employer himself assists

in setting up the bargaining agency, provides the machinery by which the bargaining representatives are chosen, allows the elections to be conducted on his premises and at his expense and pays the representatives for the time devoted to bargaining, he is manifestly taking too great a part in a matter with which he is supposed to have nothing whatever to do. Collective bargaining becomes a delusion and a snare if the employer, either directly or indirectly, is allowed to sit on both sides of the bargaining table; and, with the great advantage that he holds as the master of pay and promotions, he will be on both sides of the table if he is allowed to take any part whatever in the choice of bargaining representatives by the employees.

*American Enka Corp. v. NLRB*, 119 F.2d 60, 62–63 (4th Cir.1941); *see also NLRB v. Norfolk Southern Bus Corp.*, 159 F.2d 516, 518 (4th Cir.1946), *cert. denied*, 330 U.S. 844, 67 S.Ct. 1085, 91 L.Ed. 1290 (1947) ("Promotion and sponsorship by the employer ... of an organization for collective bargaining is ... condemned" by the Act).

Although § 8(a)(2) "has effectively achieved its goal of eliminating traditional company unions[,] ... the concern over company unions is not a moot point." Robert B. Moberly, *The Worker Participation Conundrum: Does Prohibiting Employer–Assisted Labor Organizations Prevent Labor–Management Cooperation?*, 69 Wash.L.Rev. 331, 345 (1994). This is so because of the "broad scale implementation of employee participation programs throughout American industry." Dennis M. Devaney, *Much Ado About Section 8(a)(2): The NLRB And Workplace Cooperation After Electromation And du Pont*, 23 Stetson L.Rev. 39, 50 (1993). These programs, "[w]hile usually less overt, ... foster the same concerns of employer domination or interference that section 8(a)(2) was intended to counter."

---

**1.** Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in § 7. Although the Board found Peninsula in violation of both §§ 8(a)(1) and 8(a)(2), it is apparent that the § 8(a)(2) violation is derivative of § 8(a)(1). *See* Note, *Labor Law's Alter Ego Doctrine: The Role*

*Of Employer Motive In Corporate Transformations*, 86 Mich.L.Rev. 1024, 1025 n. 11 (1988). Because there does not appear to be an independent violation of § 8(a)(1), we consider only the § 8(a)(2) charge. *See Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 698 n. 4, 103 S.Ct. 1467, 1472 n. 4, 75 L.Ed.2d 387 (1983).

Moberly, *supra,* at 345. Nevertheless, perhaps due in part to the fact that employee participation programs have become a "vital part of American industry today," *id.* at 359; even the Board has recognized that there is "some room" for lawful cooperation between employers and employees through the use of such programs. *See E.I. du Pont de Nemours & Co.,* 311 N.L.R.B. 893 (at 893) (1993). In this respect, we find particular force in the words of Judge John Minor Wisdom:

> No one can question the rightness of a policy intended to preserve the integrity of collective bargaining by labor representatives free of interference from management. Everyone would agree that in carrying out this policy the Board and the courts should regard employer-employee committees with suspicion and scrutinize them carefully in order to prevent an employer's using a committee as a company-dominated labor organization or as a device for frustrating rights guaranteed labor under Section 7 of the Act. But this policy becomes too much of a good thing when it is pushed so far as to leave no place for a bona fide, socially desirable employee committee or joint employer-employee committee that is something less than a labor organization and something more than a Great Books Study Group.

*NLRB v. Walton Mfg. Co.,* 289 F.2d 177, 182 (5th Cir.1961) (Wisdom, J. dissenting).

## II

We now turn to the facts of this case. Peninsula, a Maryland corporation located in Salisbury, Maryland, operates as a hospital and provides medical and professional care services to the general public. Peninsula employs approximately 1,800 employees, including approximately 400 registered nurses and 100 licensed practical nurses.

The NSO has existed since at least 1968. Since its founding, the NSO has served as a forum for nurses to discuss, consider, and evaluate professional nurse practice issues and for continuing nursing education. At all times, NSO meetings have been held in Peninsula facilities, and nurses have received their regular pay or continuing education credits for attending NSO meetings. While membership in the NSO originally was limited only to registered and licensed practical nurses employed in Peninsula's nursing department, membership was opened up in 1988 to include nurses who were classified as employees of other departments.

The NSO's by-laws date back to 1976. According to the 1976 by-laws, the original purpose of the NSO was:

> [T]o provide an opportunity for free communication and share in the planning and evaluation of nursing services. The [NSO] contributes to and works within the framework of the philosophy and objectives of the Nursing Services Department.

(J.A. 638). The most recent by-laws appearing in the record are dated April 1991. These by-laws set forth the "philosophy" of the NSO as being substantially similar to the above-stated purpose of the 1976 by-laws, with the addition of the following sentence: "The focus of this organization is to act as a Liaison between nurses, all departments, Nursing Management, and Administration." (J.A. 612).

Until 1988, the NSO was funded exclusively by voluntary annual membership dues of one dollar. Members who paid these dues received flowers in the event of their marriage, the birth of a child, or the death of a family member. When it became apparent that the voluntary dues were insufficient to cover the NSO's expenses, Peninsula began budgeting $500 annually for the NSO.

At all times relevant to this case, Karen Poisker has been Peninsula's Vice–President of Nursing.[2] Ms. Poisker was first employed by Peninsula as a registered nurse and rose through the nursing ranks to the position of Vice–President of Nursing. Throughout her employment with Peninsula, Ms. Poisker has been a member of the NSO. Upon becoming Vice–President of Nursing, Ms. Poisker not only retained her NSO membership, but she also has acted as an adviser to the NSO and

---

**2.** The Vice–President of Nursing is one of eight members on Peninsula's Executive Staff, which formulates Peninsula's annual budget. As part of the budget process, each member of the Executive Staff makes wage recommendations for their areas of responsibilities.

has served on the NSO's Executive Committee, which is a group that meets to discuss and formulate agendas for NSO meetings. Ms. Poisker, as Vice–President of Nursing, does not hold an office in the NSO.

Because nurses' participation in NSO meetings has varied over the years according to the nurses' interest in particular scheduled topics, the NSO, in the autumn of 1989, began to look for ways to improve attendance at NSO meetings. During the NSO's November 28, 1989, meeting, which Ms. Poisker attended, the NSO Executive Committee recommended that representatives for each nursing unit be specifically designated to attend monthly NSO meetings and to report back to the staff of the area represented. The Executive Committee also recommended that the number of open meetings be reduced from one per month to one per quarter, and that the position of NSO president be abolished and replaced by a chairperson and a co-chairperson. According to the minutes of this meeting, Ms. Poisker addressed the members concerning the NSO:

> Ms. Poisker also stated that the main concern of NSO is that we have major concerns throughout all of nursing; concerns such as weekend differential, clinical ladder, etc. We need to have a way to communicate these major issues to all of the nurses. NSO can accomplish that if we have a representative who is willing to participate. She pointed out that management needs to make a commitment to get these individuals here at these meetings. This can be accomplished by prescheduling and seeing that these nurses get here to these meetings. Ms. Poisker stated that they have tried listening sessions, prescheduled meetings, etc., and the attendance is always poor. Ms. Poisker stated that in some instances it is more important to get the concerns directly from the staff instead of having them filtered through management.

(J.A. 418). Because no NSO meeting was planned for December 1989, the changes were set for discussion at the January 1990 NSO meeting.

On January 9, 1990,[3] nurses in the hospital operating room staged a "job action" to voice their complaints about various work-related issues, including wages, overtime, and staffing. There is nothing in the record to suggest that the NSO was involved with this job action in any respect. Thereafter, on January 16, the NSO held an open meeting, at which approximately 40 NSO members, including Ms. Poisker, attended. This meeting, following closely on the heels of the operating room nurses' job action, quickly deteriorated from the regular agenda to a disorderly set of discussions about what had occurred during the job action. Nurses who were present at this meeting took the opportunity to question Ms. Poisker about many issues, including wages, benefits, and scheduling. At the same time, the nurses also were having other conversations about their concerns among themselves.

Sometime during January 1990, the Maryland Nurses Association ("Association")[4] began an organizational effort at the hospital. Peninsula management learned of this effort by the end of the month. Eventually, the Association filed a petition for an election in the hospital professional unit. The professional employees voted against representation during an election held on April 26.

On February 26, Ms. Poisker, in her capacity as Vice–President of Nursing, distributed a letter to the entire nursing staff in order to convey her thoughts "about where we are now and where we go from here as a progressive Nursing Department." Ms. Poisker indicated that she had talked to many nurses, individually and in small groups, and from those conversations she believed that the major issues of concern to nurses could be categorized into four groups: (1) insufficient involvement in decision-making, (2) poor communications, (3) staffing and related issues, and (4) salaries and benefits. Ms. Poisker then addressed each of these issues. Ms. Poisker's only substantive reference to the NSO appears when she addressed the issue of decision-making:

---

3. Unless otherwise noted, all dates hereinafter referred to are 1990.

4. The Maryland Nurses Association later became the Professional Staff Nurses Association.

Last fall, we began a reorganization of the NSO to better utilize it as a means for active problem solving and decision making regarding nursing department policies, practice issues, and projects (e.g. career paths, shared governance, clinical ladder, budget process). This change was agreed upon in the November NSO meeting and was targeted to be put into effect for the January NSO meeting. I am confident that with the *support* of all and *participation* of dedicated representatives from each area we will have a means to affect change and involve staff in decision making.

(J.A. 657) (emphasis in original). In addressing the issues of staffing, salaries, and benefits, Ms. Poisker stated that Peninsula had hired consultants to examine nurses' "entire compensation package" and that Peninsula's Human Resources Department would be conducting a "benefits survey" to determine priorities for the next budget. Ms. Poisker did not suggest that the NSO would have any role in this process.

At an NSO meeting the following day, Susan Steelman, the NSO President, reviewed the minutes of the November 1989 meeting and the suggested changes to the NSO's structure. Ms. Steelman then introduced Jeff Corrigan, Peninsula's Vice President of Human Resources, who presented the benefits survey to the nurses in attendance. In this survey, which was conducted hospital-wide, each employee was: (1) asked to rank a list of benefits and possible improvements in order of importance, (2) given information on the pension plan and possible improvements, and (3) asked about his or her preferences in exchanging some current benefits for other benefits. Neither Mr. Corrigan's presentation nor the survey were prepared specifically for the NSO or its members. Instead, Mr. Corrigan and other Human Resources personnel conducted between 50–60 such meetings throughout the hospital and reviewed approximately 1,100 completed questionnaires. Mr. Corrigan chose to make his presentation at the NSO meeting because it presented him with an opportunity to address a large group of employees at one time.

On March 20, the NSO Executive Committee met. Ms. Poisker attended this meeting, as did 19 area representatives. At this meeting, the November recommendations were approved and, additionally, it was decided that the NSO co-chairpersons would give quarterly reports to a committee of Peninsula's Board of Trustees. Two registered nurses, Susan Matthews and Jan Schaffner, neither of whom was a supervisor or member of management, were elected as co-chairs of the NSO.

On March 27, the NSO held an open quarterly meeting. At this meeting, Ms. Schaffner stated, according to the minutes, that "she sees NSO as an advocate for nursing where suggestions, complaints, etc. can be discussed and that she feels that NSO will become a bridge between nurses and nursing management." (J.A. 439). Following this meeting, Ms. Matthews and Ms. Schaffner, without the knowledge of either Ms. Poisker or Peninsula management, decided to establish an agenda for the next NSO meeting. Rather than set the agenda themselves, they circulated a memo to the NSO area representatives soliciting topics to be used in preparing the agenda for the upcoming NSO meeting. While Ms. Matthews and Ms. Schaffner expected responses concerning nurse practice issues, the majority of responses which they received concerned wages, benefits, and working conditions. Believing that they could not simply ignore the responses, Ms. Matthews and Ms. Schaffner informed Ms. Poisker of the responses and of their intention to place them on the upcoming agenda. Ms. Poisker responded that she would not participate in any discussion of those issues because the subjects were not appropriate for NSO consideration and because of the pending union vote.

At the April 24 NSO meeting, Ms. Matthews, using a flip-chart, presented a list of the concerns which she and Ms. Schaffner had received in response to their April 11 memo. The issues were not discussed or debated at this meeting. The minutes of this meeting reflect that it was decided that some of the ideas needed to be prioritized by the NSO Recruitment and Retention Committee, of which Ms. Poisker was a member.

The issues presented at the April 24 meeting do not appear to have been mentioned again at an NSO meeting until October 23, when Ms. Poisker provided an oral and written update of the status of the nurses' concerns. Ms. Poisker informed the nurses that Peninsula had implemented steps to rectify several of their concerns. However, Peninsula had done this as part of the normal budget process which began in February 1990, prior to the April 24 NSO meeting. Ms. Poisker also distributed a survey to the nurses in attendance, asking them to identify four issues that they felt the nursing and hospital administration should be aware of in their nursing area and to state two things which they believed would make an immediate positive change in their area. Apart from this meeting, Ms. Poisker, through the nursing supervisory staff, also distributed this survey to every nurse in the hospital.

There is no evidence in the record to suggest that the NSO has ever negotiated or bargained with Peninsula concerning terms or conditions of employment. Indeed, the testimony is to the opposite. For example, Linda Townsend, a nurse who was called by the Board's General Counsel to testify at the hearing before the ALJ, testified that it was not the focus of the NSO to address wage and hour type issues. Similarly, Ms. Matthews, who Peninsula called as a witness, when asked whether the NSO could serve nurses better than an outside union, stated that the NSO did not view itself in that capacity. When pressed further, Ms. Matthews stated that she personally did not believe that the NSO could handle nurses' problems and concerns better than an outside union.

On January 8, 1991, the Association filed a charge with the Board alleging that Peninsula had violated §§ 8(a)(1) and 8(a)(2) by dominating, interfering, and supporting the NSO.[5] The ALJ concluded that the NSO is a labor organization within the meaning of § 2(5) and that Peninsula had violated §§ 8(a)(1) and 8(a)(2), as charged, with respect to its relationship with the NSO. Based

on these conclusions, the ALJ issued a recommended order requiring Peninsula to cease and desist dominating, assisting, or contributing financial or other support to the NSO or any other labor organization; to cease and desist interfering with, restraining, or coercing in any like or related manner with employees in the exercise of their § 7 rights; to post a notice of the violations at the hospital, and to notify the Regional Director of the steps taken to comply with the order. The Board thereafter affirmed the ALJ's findings and conclusions, and adopted the ALJ's recommended order. This action followed.

### III

#### A.

As we have noted, Peninsula's only contention is that the Board erred in determining that the NSO is a "labor organization" within the meaning of § 2(5) of the Act. It is clear from the language of § 8(a)(2) that a finding that the NSO is a "labor organization" is a necessary prerequisite to a conclusion that Peninsula violated that section. In § 2(5), Congress defined the term "labor organization" for purposes of the Act as being:

> [A]ny organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

"Under this broad definition, it is often difficult to determine whether employee committees, or other groups of employees not traditionally viewed as unions, are labor organizations within the meaning of the Act." 1 Patrick Hardin, *et al., The Developing Labor Law* 290–91 (3d ed.1992); *see generally* Annotation, *Employee Committee Or Similar Group As "Labor Organization" Under The National Labor Relations Act (29 U.S.C. §§ 151 et seq.),* 75 A.L.R.Fed. 262 (1985).

---

**5.** The Association also charged that Peninsula had violated § 8(a)(1) by soliciting grievances from employees and promising to attempt to rectify them. The administrative law judge ("ALJ") rejected this allegation, and this issue is not before us.

■ The question of whether an organization is a "labor organization" is primarily one of fact, *see NLRB v. Long Beach Youth Center, Inc.,* 591 F.2d 1276, 1278 (9th Cir. 1979); *cf. NLRB v. Southern Seating Co.,* 468 F.2d 1345, 1348 (4th Cir.1972) ("[t]he determination whether McDaniel was a 'leadman,' ... or a supervisor is a question of fact"); although it also involves application of the controlling law—*i.e.,* § 2(5)—to the facts. *See NLRB v. United Ins. Co. of Am.,* 390 U.S. 254, 260, 88 S.Ct. 988, 992, 19 L.Ed.2d 1083 (1968). The determination of whether an employee organization is a "labor organization" is a matter within the Board's expertise and, therefore, lies in the first instance with the Board. *Marine Engineers Beneficial Ass'n v. Interlake S.S. Co.,* 370 U.S. 173, 178–82, 82 S.Ct. 1237, 1240–42, 8 L.Ed.2d 418 (1962). We must concede that an organization is a "labor organization" whenever the Board has made a "reasonably arguable" case to that effect. *Id.* at 182, 82 S.Ct. at 1242; *see also NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944) ("where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, ... the Board's determination ... is to be accepted if it has 'warrant in the record' and a reasonable basis in law"). While the Board's findings and conclusions, whether categorized as matters of fact or mixed questions of law and fact, are thus entitled to "considerable deference," *Florida Steel Corp. v. NLRB,* 601 F.2d 125, 129 (4th Cir.1979); we must remain cognizant of our judicial "responsibility for assuring that the Board keeps within reasonable grounds." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

Sections 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e) and (f), require us to uphold the Board's factual findings if they are supported by substantial evidence on the record considered as a whole. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). It is "more than a scintilla but less than a preponderance," *Elliott v. Ad-*

*ministrator, Animal and Plant Health Inspection Serv., USDA,* 990 F.2d 140, 144 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 191, 126 L.Ed.2d 149 (1993); and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). While the "substantial evidence" standard of review requires "due deference" to the Board's findings, *NLRB v. Brown,* 380 U.S. 278, 292, 85 S.Ct. 980, 988–89, 13 L.Ed.2d 839 (1965); "it does not follow ... that the findings of the [Board] are to be mechanically accepted." *Flack v. Cohen,* 413 F.2d 278, 279 (4th Cir.1969). "Rather, we are obliged to scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the Board." *NLRB v. Consolidated Diesel Elec. Co., Div. of Condec Corp.,* 469 F.2d 1016, 1021 (4th Cir.1972). In addition, we must ensure that the Board's findings are not based on speculation or suspicion, as these register no weight on the substantial evidence scale. *NLRB v. Instrument Corp. of Am.,* 714 F.2d 324, 328 (4th Cir.1983); *Torrington Co. v. NLRB,* 506 F.2d 1042, 1047 (4th Cir.1974). As to the Board's application of the law to the facts, we must sustain the Board's determination if it is reasonable and consistent with the Act. *NLRB v. Yeshiva Univ.,* 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980).

### B.

In support of its position that the Board erred in determining that the NSO is a "labor organization" within the meaning of § 2(5), Peninsula specifically argues that the NSO's purpose and function are not to deal with Peninsula over matters affecting employment and, further, that the NSO does not deal with Peninsula over employment matters. We therefore limit our focus to the "dealing with" aspect of § 2(5), which is the critical question in most cases involving an allegation of an employer's violation of § 8(a)(2) through domination of an employee organization. *See Electromation, Inc.,* 309

N.L.R.B. 990, 1004 (1992) (Oviatt, Member concurring), *enforcement granted*, 35 F.3d 1148 (7th Cir.1994).

◼ An employee organization which does not exist for the purpose of dealing with, or does not actually deal with, an employer over matters affecting the employment cannot be deemed to be a "labor organization" as that term is used in the Act. *See Kanawha Valley Labor Council, AFL–CIO v. American Fed. of Labor and Congress of Indus. Orgs.*, 667 F.2d 436, 439 (4th Cir.1981) ("nothing has been alleged in the complaint which would indicate that KVLC deals with employers over matters affecting the employees. Absent such a demonstration, KVLC is not a 'labor organization' ").[6] While this Court has not had occasion to discuss in detail the meaning of the phrase "dealing with" as it is used in § 2(5), it has, in construing that section, recognized that "a principal function—indeed, the most important function—of a 'labor organization' is to carry on collective bargaining." *NLRB v. Annapolis Emergency Hosp. Ass'n, Inc.*, 561 F.2d 524, 537 (4th Cir.1977) (in banc).[7] However, § 2(5), which speaks in terms of employee organizations which "deal with" employers over matters affecting the employment, is not limited in its scope to prohibition of activity which can only be classified as "collective bargaining." [8] Instead, as the Supreme Court held in *NLRB v. Cabot Carbon Company*, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959), which is the leading case in this area, the phrase "dealing with" as used in § 2(5) includes activity which is broader than "collective bargaining." 360 U.S. at 210–13, 79 S.Ct. at 1020–22.

In *Cabot Carbon*, the Supreme Court reversed an opinion of the Fifth Circuit in which that court had denied enforcement of a Board order based on its conclusion that the employee committees at issue were not labor organizations within the meaning of § 2(5) and, therefore, no § 8(a)(2) violation had occurred. *See* 256 F.2d 281 (5th Cir.1958). The employer in *Cabot Carbon* had established the employee committees in part to handle employee grievances, a fact which, by itself, the Supreme Court found sufficient to constitute "dealing with" and, consequently, to bring the committees within the § 2(5) definition of "labor organizations." 360 U.S. at 213, 79 S.Ct. at 1021–22. Additionally, the Supreme Court found that other committee activity—including the making and discussion of proposals with management concerning seniority, job classification, job bidding, working schedules, holidays, vacations, sick leave, a merit system, wage corrections, and improvement of working facilities conditions—coupled with the employer's frequent acceptance of such proposals, also constituted "dealing with" within the meaning of § 2(5). 360 U.S. at 213–14, 79 S.Ct. at 1021–22. The Supreme Court specifically recognized that the committees never attempted to negotiate any formal bargaining contract with the employer. 360 U.S. at 213, 79 S.Ct. at 1021–22.

"Since *Cabot Carbon*, the Board and the courts have generally given a broad interpretation to the 'dealing with' requirement" of § 2(5). *The Developing Labor Law, supra*, at 294.[9] However, while *Cabot Carbon* es-

---

6. We note that an organization need not actually "deal with" an employer in order to be deemed a "labor organization" under § 2(5). Instead, as § 2(5) provides, the organization need only "exist for the purpose, in whole or in part, of dealing with" an employer. However, as a practical matter, in many cases, the best evidence of the purpose of the organization is what it actually does rather than what it is created to do.

7. This quoted language comes from Judge Winter's original dissent from the panel opinion. The majority of the Court, sitting in banc, subsequently adopted Judge Winter's dissenting opinion as part of the opinion of the Court. *See* 561 F.2d at 526.

8. Collective bargaining "has the well understood meaning in the law of settling disputes by negotiation between employer and the representative of the employees." *United Construction Workers v. Haislip Baking Co.*, 223 F.2d 872, 877 (4th Cir.), *cert. denied*, 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).

9. "The NLRB has interpreted *Cabot Carbon* to bring almost all employee groups within the realm of section 2(5), with the exception of programs that include all of a company's employees and programs that constitute total delegations of traditional management functions to a group of employees." Note, *Labor–Management Cooperation After Electromation: Implications For Workplace Diversity*, 107 Harv.L.Rev. 678, 685 (1994).

tablishes that conduct does not have to rise to the level of collective bargaining in order to constitute "dealing with" under § 2(5), it does not set forth any limitation as to the meaning of that term. *NLRB v. Streamway Div. of Scott & Fetzer Co.*, 691 F.2d 288, 292 (6th Cir.1982). As Board Member Devaney stated in his concurring opinion in *Electromation:* "*Cabot Carbon's* rejection of the notion that 'dealing with' is synonymous with collective bargaining failed to delineate the lower limits of the conduct: if 'dealing with' is less than bargaining, what is it more than?" 309 N.L.R.B. at 1002. For our purposes here, the Board's most notable discussion of what constitutes "dealing with" under § 2(5) is set forth in *Electromation* and *du Pont*, in which the Board found that the particular employee committees were employer-dominated labor organizations within the meaning of §§ 2(5) and 8(a)(2). While we need not dwell on the specific facts of those cases, certain aspects of the Board's interpretation of what constitutes "dealing with" under § 2(5) merit comment.

In *Electromation*, the Board stated that the term "dealing with" must be viewed as meaning a "bilateral mechanism involving proposals from the employee committee concerning the subjects listed in [§] 2(5), coupled with real or apparent consideration of those proposals by management." 309 N.L.R.B. at 995 n. 21. The Board further stated that "[a] unilateral mechanism, such as a 'suggestion box,' or 'brainstorming' groups or meetings, or analogous information exchanges, does not constitute 'dealing with.'" *Id.*[10] More recently, in *du Pont*, the Board commented further on this subject:

That "bilateral mechanism" ordinarily entails a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required. If the evidence establishes such

a pattern or practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing.

311 N.L.R.B. at 894. The Board continued by citing examples of permissible activity:

[A] "brainstorming" group is not ordinarily engaged in dealing. The purpose of such a group is simply to develop a whole host of ideas. Management may glean some ideas from this process, and indeed may adopt some of them. If the group makes no proposals, the "brainstorming" session is not dealing and is therefore not a labor organization.

Similarly, if the committee exists for the purpose of sharing information with the employer, the committee would not ordinarily be a labor organization. That is, if the committee makes no proposals to the employer, and the employer simply gathers the information and does what it wishes with such information, the element of dealing is missing, and the committee would not be a labor organization.

*Id.*

As we understand this "bilateral mechanism" analysis, several general principles are readily apparent. In summary, these principles are: (1) while the term "dealing with" connotes activity which is broader than collective bargaining, an employer does not necessarily "deal with" its employees merely by communicating with them, even if the matters addressed concern working conditions; (2) "dealing" occurs only if there is a "pattern or practice" over time of employee proposals concerning working conditions, coupled with management consider-

---

**10.** As noted above, the Seventh Circuit recently granted enforcement of the Board's *Electromation* order. With respect to the "dealing with" issue, the Seventh Circuit—after reviewing *Cabot Carbon* and, to a lesser extent, the Board's "bilateral mechanism" test—concluded that substantial evidence supported the Board's determination that the activities of Electromation's employ-

ee committees constituted "dealing with" *Electromation.* 35 F.3d at 1159. Apart from the "dealing with" issue, the Seventh Circuit also addressed other issues, not present here, which relate to the legality *vel non* of employee committees under the Act. We have carefully reviewed the Seventh Circuit's *Electromation* opinion and find nothing inconsistent with this opinion.

ation thereof; (3) isolated instances of the conduct described in number two do not constitute "dealing;" and (4) management may, in certain circumstances, gather information from employees about working conditions and may even act on that information without necessarily "dealing with" them. Generally speaking, we have no quarrel with this analysis because we believe that, when properly applied, it recognizes an important point concerning §§ 2(5) and 8(a)(2):

> [L]ogic and experience under the Act ... dictate that not all management efforts to communicate with employees concerning company personnel policy are forbidden on pain of violating the Act. An overly broad construction of the statute would be as destructive of the objects [of] the Act as ignoring the provision entirely.

*Streamway,* 691 F.2d at 292; *see also Electromation,* 309 N.L.R.B. at 999 (Devaney, Member concurring) (§ 8(a)(2) "prohibits a specific form of employer conduct" and "is not a broad-based ban on employee/employer communications").[11] Undoubtedly, in cases such as this one, "the difference between communication of ideas and a course of dealings at times is seemingly indistinct." *Streamway,* 691 F.2d at 294. However, it is incumbent upon the Board and the courts to carefully make this distinction in order to ensure not only the protection of employees' § 7 rights, but also the protection of legitimate employer-employee cooperative efforts.

## IV

With these principles in mind, we now examine the Board's decision. The essence of the Board's determination that the NSO is a labor organization within the meaning of § 2(5) is that although originally the NSO may have been merely a social or educational organization, it changed its purpose in late 1989 and, from thereafter, it existed to deal with, and in fact dealt with, Peninsula concerning matters affecting the nurses' employment.[12] We do not find substantial evidence in the record to support the Board's determination in either respect. Instead, we believe that the record as a whole, in light of the "bilateral mechanism" analysis, makes it clear that the purpose of the NSO has remained constant throughout the relevant period of time and that purpose has not included dealing with Peninsula over matters affecting employment, and further that the NSO did not actually engage in a "pattern or practice" of making proposals to which Peninsula responded (*i.e.,* "dealing with").[13]

### A.

The Board contends that the change in the NSO's purpose is evidenced in large part by certain oral and written statements made by Ms. Poisker. For example, at the November 28, 1989, NSO meeting, Ms. Poisker, speaking in support of restructuring the NSO, stated that there existed a need for the NSO to "communicate" with nurses concerning matters such as "weekend differential" and "clinical ladder," which are presumably matters affecting the employment within the scope of § 2(5). We fail to see how this statement signals a change in the NSO's purpose since it does not indicate that the

11. As the Supreme Court in *Cabot Carbon* recognized, the Act does not "prevent employers and employees from discussing matters of mutual interest concerning the employment relationship...." 360 U.S. at 218, 79 S.Ct. at 1024. Instead, the Act "merely precludes the employers from dominating, interfering with or supporting ... employee committees which Congress has defined to be labor organizations." *Id.*

12. Because the Board's discussion and analysis of this issue in its decision and the recommended order is not particularly helpful, we have gleaned the substance of the Board's determination largely from its brief.

13. In reaching this conclusion, we note that the undisputed evidence establishes that several months prior to any union activity occurring at the hospital, the NSO began to change its structure in order to increase attendance and involvement at NSO meetings. Thereafter, unrelated to the NSO, the operating room nurses conducted their job action and, at roughly the same time, the Association began an organizing campaign at the hospital. In light of these latter occurrences, issues such as wages, hours, and other working conditions were being actively discussed by the hospital nurses who, of course, comprise the membership of the NSO. However, even during the restructuring of the NSO and the Association's organizing campaign, the NSO was not viewed, and we believe did not act, as a substitute for a union.

NSO would do anything other than communicate concerning these matters. As we have noted, communication between employers and employees, even concerning matters affecting employment, does not necessarily constitute "dealing with." [14]

The Board also relies upon Ms. Poisker's February 26 letter as evidence that the NSO had changed its purpose in order to deal with Peninsula. Ms. Poisker, in her capacity as Vice–President of Nursing, directed the letter to all hospital nurses in order to convey her thoughts concerning matters which nurses had raised with her throughout the hospital in light of the Association's organizing activity.[15] In response to one of the nurses' apparent concerns—insufficient involvement in decision-making—Ms. Poisker stated that the NSO had been reorganized "to better utilize it as a means for active problem solving and decision making regarding nursing department policies, practice issues and projects (e.g., career paths, shared governance, clinical ladder, budget process)." (J.A. 657). Again, we fail to see the significance of this statement. While the Board assumes that "problem solving and decision making" concerning these matters must necessarily constitute "dealing," there is simply no evidence in the record to warrant that assumption. We believe that this is particularly true when the letter is viewed in its entirety. As we have previously noted, Ms. Poisker also addressed other issues in this letter, including wages and benefits, and while she stated that Peninsula was undertaking measures to review priorities for the next budget, she did not indicate that the NSO would have any involvement in this process.

As further support for its finding that the NSO changed its purpose, the Board points to the January 16 NSO meeting, during which some of the nurses directed inquiries concerning employment matters to Ms. Poisker. However, in relying upon this meeting, the Board appears to have ignored the fact that the questioning of Ms. Poisker was entirely spontaneous. Although the meeting began normally, it quickly became disorderly, with the nurses discussing among themselves and with Ms. Poisker the operating room nurses' job action, which had occurred a week earlier, and other similar matters. This unplanned, isolated incident simply does not warrant a reasonable inference that the NSO had changed its purpose. Moreover, this meeting appears to have become essentially a "brainstorming" session, which the Board indicated in *du Pont* is permissible.[16]

Likewise, the Board's reliance on the survey prepared by Ms. Schaffner and Ms. Matthews is misplaced. It is undisputed that Ms. Schaffner and Ms. Matthews, the new co-chairs of the NSO, distributed this survey for the purpose of seeking input from nurses concerning the April 24 NSO meeting agenda, and that they did not intend to solicit responses concerning matters affecting employment. The Board contends that because many of the survey responses concerned employment matters, the purpose of the survey must have been to gather that information and thereafter present it to management. We find this contention to be purely speculative and directly contrary to the undisputed evidence in the record.

The Board also argues that a change in the NSO's purpose is evidenced by the fact that Mr. Corrigan attended the February 27 NSO meeting and distributed the hospital benefits survey to the nurses in attendance. The undisputed evidence in the record establishes that Mr. Corrigan and his staff distributed this survey hospital-wide, and that he chose to distribute the survey at this NSO meeting,

---

14. Similarly without merit is the Board's reliance on Ms. Schaffner's comment at the March 27 NSO meeting, in which she stated that she sees NSO as an "advocate for nursing where suggestions, complaints, etc., can be discussed" and that she believes that the NSO will become a "bridge" between nurses and management. (J.A. 439).

15. We note that Ms. Poisker did not send this letter in her capacity as an NSO member or advisor, did not limit its distribution only to NSO members, and did not attempt to address matters only affecting the NSO.

16. As the Board recognized in *du Pont*, a "brainstorming session" between management and its employees may concern employment matters without necessarily constituting "dealing." 311 N.L.R.B. at 894.

which was one of approximately 50–60 general employee meetings he and his staff attended, simply because it gave him an opportunity to address a relatively large group of employees at one·time. In light of this evidence, we cannot see how Mr. Corrigan's action at the NSO meeting supports the Board's position.

### B.

In support of its conclusion that the NSO actually dealt with Peninsula concerning matters affecting employment, the Board points mainly to the fact that Ms. Poisker was present at the April 24 NSO meeting, when Ms. Matthews used a flip-chart to present the responses to the survey which she and Ms. Schaffner received, and that Ms. Poisker provided an update of the status of the nurses' concerns at the October 23 NSO meeting. Because Peninsula had, as of October 23, implemented several measures which were seemingly responsive to some of the nurses' concerns, the Board argues that this shows that Peninsula responded to the NSO's proposals and, therefore, "dealt with" the NSO. As it has with other facts, the Board has ignored uncontradicted evidence in the record which clearly negates the inference which the Board has attached to these facts. Specifically, the undisputed evidence in the record establishes that Peninsula had planned to implement the particular measures that were the subject of Ms. Poisker's October 23 update in February as part of the budget process. There is simply no evidence to suggest that Peninsula implemented these measures in response to the April 24 NSO meeting.

Moreover, notwithstanding the fact the evidence does not support the Board's finding in this respect, we do not believe that this one instance is sufficient to constitute a "pattern or practice" so as to fall within the Board's "bilateral mechanism" analysis. If this is such a "pattern or practice," then it is hard to imagine any situation in which it would be permissible for an employer to receive information from employees and thereafter report back to them what, if anything, it has decided to do with that information. We believe that Ms. Poisker's action constitutes the type of communication which is not only not unlawful, but is actually quite logical under the circumstances of this case.

### V

We need not dwell further on the shortcomings we find with the Board's order. Based on our thorough review of the record as a whole and the controlling legal principles, we conclude that there is not substantial evidence to support the Board's determination that the NSO existed to deal with, or in fact dealt with, Peninsula within the meaning of § 2(5). As a consequence, the Board's conclusion that Peninsula violated § 8(a)(2) cannot stand. Accordingly, we grant the petition for review, set aside the decision of the Board, and deny enforcement of its order.

*PETITION FOR REVIEW GRANTED AND ENFORCEMENT DENIED.*

